2007 ND 44

**CITY OF BELFIELD, Plaintiff and Appellee,**

v.

**Frederick Eugene KILKENNY, Defendant and Appellant.**

**No. 20060176.**

Supreme Court of North Dakota.

March 22, 2007.

Robert A. Keogh, City Attorney, Keogh Law Office, Dickinson, N.D., for plaintiff and appellee.

N. Robert Pesall, Flandreau, S.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Frederick Kilkenny appeals the district court judgment finding him guilty of violating a Belfield city ordinance that prohibits a nuisance in the form of excessive, continuous, or untimely dog barking. Concluding that the ordinance provides minimum guidelines for the reasonable police officer, judge, or jury charged with its enforcement and provides a reasonable person with adequate and fair warning of the prohibited conduct, we affirm.

I

[¶ 2] The municipal court found Kilkenny guilty, and he appealed to the district court. At the district court trial, a neighbor testified that he called the police to complain about Kilkenny's two dogs barking loudly enough to be heard inside his house "off and on all day," "continuous[ly]," and "after hours" one evening between 8 and 9 p.m. The investigating officer testified that he heard the dogs barking and looked for whatever might be causing the dogs to bark. The officer testified he found nothing awry, so he did not issue a citation at that time. Upon receiving another complaint by the same neighbor thirty minutes later, the officer testified, he returned to the residence, confirmed that the dogs were barking again, and issued a citation, leaving it in the screen door. The officer testified he knew Kilkenny was not at home but had hired Melissa Gjermundson to care for his dogs. The neighbor testified that another law enforcement officer had also investigated Kilkenny's dogs on a different occasion. According to the neighbor's testimony, that officer made Kilkenny keep the dogs locked in the house from 7 p.m. to 7 a.m., but told him the dogs could be outside in the fenced yard the rest of the time. Gjermundson testified she knew people had complained about the dogs in the past and a schedule had been established to prevent further complaints about barking. She testified that she failed to put the dogs inside by 7 p.m. because her work shift lasted until 9:00 that night. She testified a police officer notified her of the neighbor's complaint at 8:50 p.m. and she arrived in Belfield at 9:45 p.m. to put the dogs inside; however, she decided to take the dogs to her home because she "just didn't want to deal with it anymore."

[¶ 3] At a bench trial, the district court found Kilkenny guilty, imposed a $20 fine, and placed him on thirty days' probation. Kilkenny appealed.

[¶ 4] The municipal court had jurisdiction under N.D.C.C. § 40–18–01. The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06(4). This appeal is timely under N.D.R.App.P. 4(b). This Court has juris-

diction under N.D. Const. art. VI, § 2, and N.D.C.C. § 29–28–06.

## II

[¶ 5] Kilkenny argues that the city ordinance violates his right to substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 12 of the North Dakota Constitution, because the ordinance is unconstitutionally vague on its face.

[¶ 6] Kilkenny was convicted of violating the following municipal ordinance:

> 11.0204 Nuisance—When: *Excessive, continuous, or untimely barking,* molesting passers by, chasing vehicles, habitually attacking other domestic animals, trespassing upon school grounds, or trespassing upon private property or damaging property by a dog or cat is hereby declared to be a nuisance. Further, any dog or cat without a valid license and collar is a nuisance.

Belfield, N.D., Rev.Code § 11.0204 (emphasis added). Under section 11.0201, Belfield Revised Code, dogs older than one month must be licensed "to be or remain in the City . . . ." Further, section 11.0202, Belfield Revised Code, requires "[a]ll dogs and cats kept in the City shall be registered as to sex, breed, name and address of the owner and name of dog or cat" and imposes a $2.50 license fee for male dogs and $5.00 fee for female dogs. "Any violation of the terms of this Chapter constitutes an infraction" punishable by "a fine not to exceed $100 or . . . imprisonment not exceeding thirty (30) days, or by both . . . ." Belfield Revised Code § 11.0301.

[¶ 7] Under the Fourteenth Amendment, no State may "deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Article I, section 12 of the North Dakota Constitution also provides: "No person shall . . . be deprived of life, liberty or property without due process of law." Although the words of the federal due process clause might suggest that it governs only the procedures by which a State may deprive persons of life, liberty, or property, it has been interpreted to contain a substantive component as well, one "barring certain government actions regardless of the fairness of the procedures used to implement them . . . it serves to prevent governmental power from being used for purposes of oppression." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (internal quotations and citations omitted).

[¶ 8] The standard of review for a claimed violation of a constitutional right is de novo. *State v. Campbell,* 2006 ND 168, ¶ 6, 719 N.W.2d 374. "Generally, the rules of construction applicable to state statutes apply in the construction of municipal ordinances." *Mini Mart, Inc. v. City of Minot,* 347 N.W.2d 131, 141 (N.D. 1984). We construe statutes to avoid constitutional infirmities. *Leet v. City of Minot,* 2006 ND 191, ¶ 13, 721 N.W.2d 398. " 'Any doubt must be resolved in favor of the constitutionality of the statute.' " *State v. Tweed,* 491 N.W.2d 412, 418 (N.D.1992) (quoting *N.D. Council of Sch. Adm'rs v. Sinner,* 458 N.W.2d 280, 285 (N.D.1990)).

[¶ 9] The United States Supreme Court has distinguished between two doctrines used to challenge laws claimed to be facially unconstitutional:

> First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 612–615, 93 S.Ct. 2908, 37

L.Ed.2d 830 (1973). Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests. *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

*City of Chicago v. Morales*, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Kilkenny's failure to prevent his dogs from barking excessively, continuously, or at the wrong time does not reach a substantial amount of constitutionally protected conduct. *See Nicchia v. People of New York*, 254 U.S. 228, 230, 41 S.Ct. 103, 65 L.Ed. 235 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right."); *Village of Litchville v. Hanson*, 19 N.D. 672, 676, 124 N.W. 1119, 1120 (1910) (owning dogs is a privilege subject to licensing and fees); *but see, e.g., United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (the presumption of constitutionality is narrowed when a law impinges on the rights enumerated in the Bill of Rights, restricts participation in political processes, or discriminates against "discrete and insular minorities"). Because the ordinance at issue regulates citizens' control over their dogs and cats, we apply the test set forth in *Kolender* and its progeny.

[¶ 10] All laws must meet two requirements to survive a void-for-vagueness challenge: (1) the law must create minimum guidelines for the reasonable police officer, judge, or jury charged with enforcement of the statute; and (2) the law must provide a reasonable person with adequate and fair warning of the proscribed conduct. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *accord Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *State v. Eldred*, 1997 ND 112, ¶ 24, 564 N.W.2d 283. "We review the statute to determine if these two dictates are clear under a 'reasonable person' standard." *Eldred*, at ¶ 24 (quoting *State v. Mertz*, 514 N.W.2d 662, 668 (N.D.1994) ("In determining whether the meaning of a statute is fairly ascertainable or adequate warning is given, we view the statute from the standpoint of the reasonable person who might be subject to its terms.")).

[¶ 11] "[T]he more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (quoting *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). "For obvious reasons, the standard of certainty required in criminal statutes is more exacting than in noncriminal statutes. This is simply because it would be unthinkable to convict a man for violating a law he could not understand." *Barenblatt v. United States*, 360 U.S. 109, 137, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

[¶ 12] Although Kilkenny tries to suggest some difference between the state and federal constitutions, the essence of his argument is that residents of a small town in a farming and ranching area of the state have a different idea of what is reasonable noise than people of the United

States as a whole. This is essentially not an argument of law, but of fact to be decided by the fact finder.

## A

[¶ 13] A law will be found "unconstitutionally vague on its face because it encourages arbitrary enforcement." *Kolender*, 461 U.S. at 361–62, 103 S.Ct. 1855; *Eldred*, 1997 ND 112, ¶ 24, 564 N.W.2d 283.

[¶ 14] In this case, Kilkenny was convicted of violating the City ordinance that prohibits a nuisance in the form of excessive, continuous, or untimely dog barking. *See* Belfield Revised Code § 11.0204. A nuisance "[a]nnoys, injures, or endangers the comfort, repose, health, or safety of others . . . or [i]n any way renders other persons insecure in life or in the use of property." N.D.C.C. § 42–01–01(1), (4).

[¶ 15] "To adjudge excessive or unusual noise, officers must rely on their sense of hearing just as they must rely on their sense of sight for speeding violations or their sense of smell for DUI violations." *State v. Beyer*, 441 N.W.2d 919, 922 (N.D. 1989) (upholding a car muffler ordinance designed "to prevent excessive or unusual noise and annoying smoke"). "[T]he law does not require that every police officer have with him . . . a decibel counter to verify what he . . . hears." *Id.* (citation omitted). "After all, a police officer is not simply an emotionless, faceless enforcer, but is also a person whose peace is important since he represents the public." *Wolf v. N.D. Dep't of Transp.*, 523 N.W.2d 545, 547 (N.D.1994). "An officer's observations based upon his sense of hearing are subject to the same type of trial scrutiny, through cross examination and introduction of rebuttal evidence, as are all other observations made by an officer." *Beyer*, 441 N.W.2d at 922. The *Beyer* Court upheld the constitutionality of this anti-noise statute:

> Every motor vehicle must at all times be equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise and annoying smoke, and no person may use a muffler cutout, bypass, or similar device upon a motor vehicle on a highway.

*Beyer*, 441 N.W.2d at 920 (quoting N.D.C.C. § 39–21–37(1)). The law enforcement officer stopped Beyer because his "vehicle was 'louder than most vehicles driving around' and was 'backfiring quite loud.'" *Beyer*, 441 N.W.2d at 920. The *Beyer* Court quoted with approval cases from other jurisdictions that found the phrase "excessive noise or unusual noise" not impermissibly vague in the context of automobile regulation, including this New York case:

> The evil sought to be prevented is "excessive or unusual noise". What is unusual noise in the operation of a car has become common knowledge and anything in excess of that is excessive or unusual and any ordinary motorist should have no difficulty in ascertaining whether or not excessive or unusual noise accompanied the operation of his vehicle.

*Id.* at 921 (quoting *People v. Byron*, 17 N.Y.2d 64, 268 N.Y.S.2d 24, 26, 215 N.E.2d 345 (1966)).

[¶ 16] Other jurisdictions' dog-barking statutes with exact or similar language either were sufficiently definite to survive a void-for-vagueness challenge or were unchallenged on substantive due process grounds. *See, e.g., Patterson v. City of Richmond*, 39 Va.App. 706, 576 S.E.2d 759, 762 (2003) (finding sufficient evidence for a violation of an ordinance that prohibited dogs from barking "in an excessive, continuous, or untimely fashion"); *Town of Baldwin v. Carter*, 794 A.2d 62, 66 (Me.2002)

(finding the term "continued or repeated" not impermissibly vague); *State v. Taylor*, 128 N.C.App. 616, 495 S.E.2d 413, 416 (1998) ("The terms … 'habitually,' 'repeatedly,' 'excessive,' 'annoy,' 'disturb,' … have common ordinary meanings by which to understand and measure the noise of a particular animal."); *Commonwealth v. Ferreri*, 30 Mass.App.Ct. 966, 572 N.E.2d 585, 587 (1991) (finding the phrase "excessive barking" not impermissibly vague); *State v. Olson*, 8 Conn.App. 188, 511 A.2d 379, 380 (1986) (finding sufficient evidence of "excessive barking").

[¶ 17] Here, the Belfield police officer who issued the citation testified that he could hear the dogs barking "quite a ways down the street" and when he arrived at Kilkenny's property. When asked what excessive meant, the officer testified: "excessive is anything that disturbs the peace and tranquility of a neighborhood." He also said he understood the dog-barking ordinance to mean that a dog could be barking excessively, continuously, and at the wrong time and still not violate the ordinance if, for example, the owner's house were on fire. We think this approach imports a degree of common sense present in any reasonable law enforcement officer. Any reasonable judge or jury could infer that at least two of Kilkenny's purposes for owning two large dogs could be for property protection and warning, because he admitted that he travels frequently for extended periods. Although Kilkenny argues the City ordinance fails to narrow the almost limitless set of possibilities that could combine to constitute a violation—such as the dog's breed, time of day, type of bark, loudness of bark, location of bark, number of barks, number of dogs, distance from neighbors—we expect law enforcement, judges, and juries to weigh numerous factors all the time. Citizens notify the police when they observe suspicious, dangerous, or potentially illegal behavior. Law enforcement investigates a citizen's allegation by dispatching an officer who must rely on his or her individual knowledge of the law, experience, training, and moral character. Kilkenny implied that his neighbor's complaint was the product of an ongoing feud, although the record does not reveal this alleged vindictiveness. Once again, we rely on police officers to discern motives and judge credibility when investigating complaints. In this case, the officer investigated the neighbor's complaint. The record fails to disclose the reason for the officer's decision not to issue a citation during the first visit to Kilkenny's property. A second complaint thirty minutes later by the same neighbor resulted in a citation because the dogs were barking. While it is certainly reasonable to surmise that the dogs started barking again only because the officer arrived, the neighbor's testimony demonstrates that the dogs had been barking absent such stimulus. We conclude this is circumstantial evidence of excessive or continuous barking. Given the time of day of the complaint, the district court could have reasonably found it to be untimely barking. Furthermore, Kilkenny hired a keeper who knew about the schedule established because of past complaints about the two large-breed dogs. Even had there been no such schedule, the fact that the dogs were barking from 8:00 p.m. to 9:45 p.m. certainly could be found to be "untimely barking."

[¶ 18] As this Court said in *Beyer*, we do not require police officers to carry decibel meters to judge excessively loud car mufflers; therefore, we certainly will not require them to scientifically test the loudness of a yip, yowl or bark. The reasonable police officer will "know it when [he hears] it." *See Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) ("[T]he

Court ... was faced with the task of trying to define what may be indefinable.... But I know it when I see it....").

## B

■■■■ [¶ 19] "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited...." *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. Moreover,

> because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.

*Grayned*, 408 U.S. at 108, 92 S.Ct. 2294; *accord Eldred*, 1997 ND 112, ¶ 24, 564 N.W.2d 283. "The mere use of general language does not support a vagueness challenge: 'The test of definitiveness of a statute is met if the meaning of the statute is fairly ascertainable by reference to similar statutes or to the dictionary, or if the questioned words have a common and generally accepted meaning.' " *Olson v. City of West Fargo*, 305 N.W.2d 821, 828 (N.D. 1981) (quoting *State v. Woodworth*, 234 N.W.2d 243, 246 (N.D.1975)).

### 1

■■■ [¶ 20] "Excessive" means "being *too much or too great; immoderate; inordinate.*" *Webster's New World Dictionary* 488 (2d ed.1980). Another source defines "excessive" as "exceeding the usual, proper, or normal ... very large, great, or numerous ... greater than usual ... describes whatever notably exceeds the reasonable, usual, proper, necessary, just, or endurable...." *Webster's Third New International Dictionary of the English Language Unabridged* 792 (16th ed.1971).

When construed in the context of a public nuisance, "excessive" likely includes noise that affects health, quality of life, or enjoyment of property. *See Lindteigen v. City of Bismarck*, 1997 ND 123, ¶ 8, 565 N.W.2d 47 (concluding that the potential for excessive noise, danger to the public, and depreciation of neighboring properties exceeded the private benefit of allowing a person to build a private airport on his land zoned for agriculture). In the context of automobile anti-noise statutes, this Court held the adjective "excessive" not impermissibly vague because its meaning is "within the common knowledge of drivers." *State v. Beyer*, 441 N.W.2d 919, 921–22 (N.D.1989) (collecting cases from other jurisdictions that found automotive noise laws using the phrase "excessive or unusual noise" not unconstitutionally vague).

[¶ 21] Kilkenny's neighbor testified he could hear the dogs barking while he was inside his home. Gjermundson, the dogs' keeper, testified that Kilkenny often traveled for extended periods and hired her to take care of his dogs during his absences. Had Gjermundson failed to close the gate and allowed Kilkenny's dogs to roam the City, the dogs would still have been subject to being impounded and, according to another Belfield ordinance, destroyed if not claimed after three days. *See* Belfield Revised Code § 11.0206. Therefore, a reasonable person would hire a responsible caretaker not only to feed and water the dogs, but also to prevent the dogs, as far as reasonably possible, from harming others in any way, which includes creating a nuisance by their barking. Gjermundson failed to make other arrangements to put the dogs inside Kilkenny's home—where they apparently do not bark or cannot be heard by the neighbors.

[¶ 22] People have owned dogs longer than they have owned cars. If "excessive" is easily understood by automobile owners,

so too is that term understood by reasonable dog owners and their neighbors. As such, the term "excessive" is not impermissibly vague.

### 2

[¶ 23] "Continuous" means "going on or extending without interruption or break; unbroken; connected." *Webster's New World Dictionary* 308 (2d ed.1980). It is "characterized by uninterrupted extension in time or sequence ... continuing without intermission or recurring regularly after minute interruptions...." *Webster's Third New International Dictionary of the English Language Unabridged* 493–94 (16th ed.1971).

[¶ 24] Here, Kilkenny's neighbor testified about how the two dogs were barking:

Q. And how many dogs were there?

A. Two.

Q. And what were they doing?

A. Just barking.

Q. I mean, was it one bark, two barks?

A. Continuous, both of them, one would quit, the other would start.

Q. For what period of time did you listen to this?

A. Before I called?

Q. Yes.

A. Oh, just a matter of minutes.

Q. So they barked continuously for minutes and then you called?

A. Oh yes.

Q. Had they been quiet before that?

A. They would bark off and on all day long.

[¶ 25] A reasonable person would not think "continuous" means merely one or two barks in sequence or believe that a dog would have to bark without interruption for hour upon hour. As the neighbor explained, "one [dog] would quit, [and] the other would start." Under a reasonable person standard, the term "continuous" is not impermissibly vague.

### 3

[¶ 26] "Untimely" means "done ... before the usual or expected time; at the wrong time." *Webster's New World Dictionary* 1558 (2d ed.1980). "'The gravity of the harm from noises that disturb a person's sleep, for example, is ordinarily much greater when the noises occur at night than it is when the noises occur in the daytime.'" *Rassier v. Houim*, 488 N.W.2d 635, 640 (N.D.1992) (Meschke, J., concurring and dissenting) (quoting Restatement (Second) of Torts § 827 cmt. b (1979)). The prohibition of "untimely barking" likely means at hours when most people are seeking peace and quiet.

[¶ 27] Kilkenny's neighbor complained to the police after the two dogs allegedly had been barking between 8 and 9 p.m. The dog's keeper testified that she arrived at Kilkenny's residence at 9:45 p.m. and then took the dogs to her home to avoid any further complaints by the neighbor. The neighbor testified that the dogs were barking during the day, but he did not complain until that evening.

[¶ 28] Because the words excessive, continuous, or untimely have come within the knowledge and understanding of dog owners and their neighbors, they are not unconstitutionally vague. Additional objective standards are unnecessary to warn citizens of the prohibited conduct. Kilkenny's claim that he lacked notice of the prohibited conduct was further damaged by the fact that he hired a person not only to take care of his dogs but also to ensure the dogs were inside by a certain time every night to prevent complaints about their barking. Only when the dogs were outside and barking after that time did the neighbor complain.

### III

[¶ 29]   We affirm the judgment.

[¶ 30] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.