# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2025 ND 26

Access Independent Health Services, Inc., d/b/a Red River Women's Clinic, on behalf of itself and its patients; Kathryn L. Eggleston M.D., on behalf of herself and her patients; Ana Tobiasz, M.D. on behalf of herself and her patients; Erica Hofland, M.D., on behalf of herself and her patients; Collette Lessard, M.D. on behalf of herself and her patients,
                                                    Plaintiffs and Appellees

          v.

Drew H. Wrigley, in his official capacity as Attorney General for the State of North Dakota;
                                                    Defendant and Appellant

          and

Kimberlee Jo Hegvik, in her official capacity as the State's Attorney for Cass County; Julie Lawyer, in her official capacity as the State's Attorney for Burleigh County; Amanda Engelstad, in her official capacity as State's Attorney for Stark County; and Haley Wamstad, in her official capacity as the State's Attorney for Grand Forks County,
                                                    Defendants and Appellees

## No. 20240291

Motion for stay pending appeal from an order of the District Court of Burleigh County, South Central Judicial District, the Honorable Bruce A. Romanick, Judge.

MOTION DENIED.

Order of the Court by Crothers, Justice, in which Justice McEvers and District Judge Narum joined. Justice Tufte and Chief Justice Jensen each filed a dissenting opinion.

Meetra Mehdizadeh (argued), Astrid Ackerman (on brief), Marc Hearron (on brief), Zhuya Beatrix Lu (on brief), Jess Braverman (on brief), Caroline Elvig (on brief), Robert Niles-Weed (on brief), Melissa P. Rutman (on brief), Naz D. Akyol (on brief), Lauren A. Kelly (on brief), Liz R. Grefrath (on brief), New York, NY, and Christina A. Sambor (appeared), Bismarck, ND, for plaintiffs and appellees.

Daniel Gaustad, Philip J. Axt, and Courtney R. Titus, Joseph Quinn, Marcus C. Skonieczny, Assistant Attorneys General, Bismarck, ND, for defendant and appellant.

**Access Independent Health Services, Inc.,
d/b/a Red River Women's Clinic v. Wrigley
No. 20240291**

**Crothers, Justice.**

[¶1]   The State of North Dakota moves this Court under N.D.R.App.P. 8 and 27 for an order staying pending appeal the district court's judgment declaring N.D.C.C. ch. 12.1-19.1 unconstitutional. We deny the motion.

I

[¶2]   The State's motion to stay follows the district court's entry of summary judgment for plaintiffs in their constitutional challenge to the most recent version of North Dakota's abortion regulation statutes, N.D.C.C. ch. 12.1-19.1. The North Dakota Legislature enacted N.D.C.C. ch. 12.1-19.1 after this Court denied a writ seeking to vacate the district court's preliminary injunction of an earlier abortion regulation. The previous regulation criminalized all abortions, even those performed to preserve a woman's life or health. It provided an affirmative defense to a physician who performed a life or health preserving abortion if the physician could prove by a preponderance of the evidence the abortion was necessary to save the woman's life. *See* N.D.C.C. §§ 12.1-31-12(2), (3)(a), repealed by 2023 N.D. Sess. Laws ch. 122, § 11. We denied the State's request for a writ after interpreting our Constitution and holding "a pregnant woman has a fundamental right to obtain an abortion to preserve her life or her health." *Wrigley v. Romanick*, 2023 ND 50, ¶ 27, 988 N.W.2d 231. Because the law restricted this fundamental right, we decided our strict scrutiny standard applied. *Id.* ¶ 28. We determined the previous regulation was unlikely to satisfy the applicable test. *Id.* ¶ 40.

[¶3]   Following *Wrigley I*, the Legislature passed Senate Bill 2150, which repealed N.D.C.C. § 12.1-31-12(2) and enacted N.D.C.C. ch. 12.1-19.1, the constitutionality of which is at issue in this case. *See* 2023 N.D. Sess. Laws ch. 122, § 1. Under N.D.C.C. ch. 12.1-19.1, abortion is a class C felony. The statute defines abortion as:

1

"[T]he act of using, selling, or prescribing any instrument, medicine, drug, or any other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy of a woman, including the elimination of one or more unborn children in a multifetal pregnancy, with knowledge the termination by those means will with reasonable likelihood cause the death of the unborn child. The use, sale, prescription, or means is not an abortion if done with the intent to:

    a. Remove a dead unborn child caused by spontaneous abortion;
    b. Treat a woman for an ectopic pregnancy; or
    c. Treat a woman for a molar pregnancy."

N.D.C.C. § 12.1-19.1-01(1). The Legislature also converted the affirmative defenses under the previous law into exceptions. Section 12.1-19.1-03 provides:

"This chapter does not apply to:

1.    An abortion deemed necessary based on reasonable medical judgment which was intended to prevent the death or a serious health risk to the pregnant female.

2.    An abortion to terminate a pregnancy that based on reasonable medical judgment resulted from gross sexual imposition, sexual imposition, sexual abuse of a ward, or incest, as those offenses are defined in chapter 12.1-20, if the probable gestational age of the unborn child is six weeks or less.

3.    An individual assisting in performing an abortion if the individual was acting within the scope of that individual's regulated profession, was under the direction of or at the direction of a physician, and did not know the physician was performing an abortion in violation of this chapter."

[¶4] Plaintiffs, Access Independent Health Services, Inc., d/b/a Red River Women's Clinic and the individual physicians, on behalf of themselves and their patients, subsequently filed an amended complaint with two claims. The first alleges the law violates the physicians' right to due process under N.D. Const. art. I, § 12 because it is unconstitutionally vague. The second claim alleges the

law violates pregnant women's right to life and health preserving care under N.D. Const. art. I, §§ 1, 12. After the plaintiffs filed their amended complaint, state's attorneys in Burleigh, Cass, Grand Forks, and Stark counties filed a stipulation agreeing that if the district court entered an order finding N.D.C.C. ch. 12.1-19.1 unconstitutional, they would not enforce it "unless and until said order is vacated or overturned."

[¶5] Following the close of discovery, the State moved the district court for summary judgment, seeking to have RRWC's amended complaint dismissed with prejudice. RRWC opposed the motion, arguing there were unresolved issues of fact and that the case should proceed to trial. The court granted summary judgment in favor of RRWC, concluding that:

> "(1) the Amended Abortion Ban set forth in Chapter 12.1-19.1, N.D.C.C., as currently drafted, is unconstitutionally void for vagueness; and (2) pregnant women in North Dakota have a fundamental right to choose abortion before viability exists under the enumerated and unenumerated interests protected by the North Dakota Constitution for all North Dakota individuals, **including women**—specifically, but not necessarily limited to, the interests in life, liberty, safety, and happiness enumerated in article [I], section 1 of the North Dakota Constitution."

(Emphasis in original.)

[¶6] The State moved the district court to stay its order enjoining enforcement of N.D.C.C. ch. 12.1-19.1 pending appeal. After the district court denied the State's motion, the State filed the present appeal and an expedited motion to stay, which is presently before the Court.

II

[¶7] We start by recognizing this action involves a challenge under the North Dakota Constitution to a portion of the North Dakota Century Code. This case exclusively arises under state law, and therefore we must decide these issues primarily under our established state precedent. We must be mindful that our state Constitution is different in nature than the federal constitution. Thomas

Cooley, the prominent late nineteenth century American legal scholar, addressed our constitutional convention on July 17, 1889. S*ee Official Report of the Proceedings and Debates of the First Constitutional Convention of North Dakota*, 65-67 (1889). His treatise described the difference between the United States Constitution and a state constitution:

> "It is to be borne in mind, however, that there is a broad difference between the Constitution of the United States and the constitutions of the States as regards the power which may be exercised under them. The government of the United States is one of *enumerated* powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national Constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for *grants* of legislative power, but in the constitution of the State to ascertain if any *limitations* have been imposed upon the complete power with which the legislative department of the State was vested in its creation. . . . That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is therefore the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute. These limitations are created and imposed by express words, or arise by necessary implication."

Thomas M. Cooley, *A Treatise on the Constitutional Limitations which rest upon the Legislative Power of the States of the American Union,* 173 (2d ed. 1871).

### III

[¶8] Before turning in Part IV to our established framework for deciding whether to grant a stay, we first address issues the State raises that it admits are novel to North Dakota law.

[¶9]   The State argues the single judge ruling on a novel and complex issue is an independent ground for the stay. According to its briefing, "the State suggests that because this case involves a statute having been declared unconstitutional by a single district court judge, based on a newly identified constitutional right, and involving difficult and novel legal questions, that by itself is a sufficient reason to grant a stay pending appeal." We take each portion of this argument in turn.

A

[¶10] The State argues a stay pending appeal is appropriate when, as here, a single judge declares a statute unconstitutional. Somewhat ironically, the State relies on the writing of a single United States Supreme Court justice in *Bowen v. Kendrick*, 483 U.S. 1304 (1987) (Rehnquist, J., in chambers). However, *Bowen* did not articulate the standard the United States Supreme Court applies when addressing a motion to stay a decision pending final disposition on appeal. Rather, the *Bowen* opinion is from Justice Rehnquist, writing on his own behalf as a circuit justice and explaining why he granted a stay of a single federal district court judge's determination that a statute was unconstitutional. In that writing Justice Rehnquist expressed his view that a stay was warranted due to "[t]he presumption of constitutionality which attaches to every Act of Congress" and "that the statute remain in effect pending such review." *Id.* at 1304; *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers) (Again writing as a circuit justice and granting a stay "pending the timely filing of a jurisdictional statement and the disposition of the same by this Court.").

[¶11] Contrary to the State's suggestion, as an adjudicative body the United States Supreme Court does not grant stays based on how many judges issued the underlying decision. Rather, the United States Supreme Court applies a framework similar to ours when deciding whether to grant a stay. *See Ohio v. EPA*, 603 U.S. 279, 291 (2024) (setting out a four-factor test relating to likelihood of success and harm).

[¶12] Putting federal law aside, our jurisprudence does not support the creation of a presumption that district court rulings are incorrect. We have uniformly held that "[f]indings of the trial court are presumptively correct." *See, e.g., Great Plains Royalty Corp. v. Earl Schwartz Co.*, 2021 ND 62, ¶ 10, 958 N.W.2d 128 (quoting *McCarvel v. Perhus*, 2020 ND 267, ¶ 9, 952 N.W.2d 86). And we use a de novo standard when reviewing a district court's application of law. *See, e.g., State v. Hilgers*, 2004 ND 160, ¶ 25, 685 N.W.2d 109 ("Whether the district court's refusal to issue a subpoena violates the Sixth Amendment is a question of law, and our standard of review for a claimed violation of a constitutional right is *de novo*."). We also have regularly recognized that a party is required to comply with a district court order even if the party believes it was erroneously entered. *Holkesvig v. Welte*, 2012 ND 14, ¶ 6, 809 N.W.2d 323; *State v. Sevigny*, 2006 ND 211, ¶ 37, 722 N.W.2d 515; *Flattum-Riemers v. Flattum-Riemers*, 1999 ND 146, ¶ 11, 598 N.W.2d 499. We decline the invitation to deviate from our established law on the regularity of district court decisions.

B

[¶13] The State argues we should issue a stay because the district court's order decided "new and unexplored" legal issues. The State relies on a 1972 federal district court decision from Hawaii that was never appealed. *See Stop H-3 Ass'n v. Volpe*, 353 F. Supp. 14, 16 (D. Haw. 1972). The State concedes we have not adopted this factor, but it notes we cited the *Stop H-3* decision while articulating stay factors in *Cass County Electric Coop., Inc. v. Wold Properties, Inc.*, 253 N.W.2d 323, 326-27 (N.D. 1977). In that case, we simply noted *Stop H-3* was cited by a party, and we described *Stop H-3* as articulating a factor relating to substantial harm to the public. *Id.* Moreover, the case dealt with whether to set aside a district court's stay, which we declined to do, explaining "an opinion of the trial court on such an issue ordinarily will not be set aside unless the trial court is found to have abused its discretion." *Id.* at 327. The upshot of the State's argument is that any decision that recognizes a previously unobserved constitutional right should warrant a stay. We reject the request to adopt such a tenuous connection between the proposition advanced by the State and our precedent.

6

[¶14] We turn to our established framework for deciding whether to grant a stay pending appeal, which a party may request under N.D.R.App.P. 8(a)(2). Under our jurisprudence, we apply the following test:

> "We consider four criteria when deciding whether to grant an application for a stay: 1) a strong showing that the appellant is likely to succeed on appeal; 2) that unless the stay is granted, the appellant will suffer irreparable injury; 3) that no substantial harm will come to any party by reason of the issuance of the stay; and 4) that granting the stay will do no harm to the public interest."

*Cass Cnty. Joint Water Res. Dist. v. Aaland*, 2020 ND 196, ¶ 4, 948 N.W.2d 829 (citing *Bergstrom v. Bergstrom*, 271 N.W.2d 546, 549 (N.D. 1978)). The moving party has the burden to show that these four criteria are satisfied and weigh in favor of granting a stay. *Aaland*, ¶ 7; *Bergstrom*, at 554-55.

### A

[¶15] To satisfy the first factor, the State must demonstrate a likelihood of success on both the plaintiffs' claims. In other words, to succeed on appeal, the State must show: (1) the district court erred when it decided the law was unconstitutionally vague in violation of the physicians' due process rights; and (2) the court erred when it decided the law violated the fundamental rights of pregnant women. Under our principles of constitutional avoidance, if the State is unsuccessful on either one of these claims, we will not address the other. *See Overbo v. Overbo*, 2024 ND 233, ¶ 7, --- N.W.3d --- ("The separation of powers created by our state and federal constitutions requires courts to exercise judicial restraint and constitutional avoidance."). If the State does not succeed on both questions, the result will be a decision declaring the law unconstitutional.

### 1

[¶16] It is unlikely the State will succeed in showing this law is not unconstitutionally vague. Under our state Constitution, no person shall be deprived of life, liberty, or property without due process of law. N.D. Const.

art. I, § 12. Vague laws are unconstitutional because they do not give fair warning and allow for discriminatory enforcement. *City of Fargo v. Roehrich*, 2021 ND 145, ¶ 6, 963 N.W.2d 248. "Vague laws may trap the innocent because they fail to provide adequate warning of what conduct is prohibited, and they may result in arbitrary and discriminatory application because a vague law delegates basic policy matters to those who apply the law, allowing the law to be applied on an ad hoc and subjective basis." *State v. Holbach*, 2009 ND 37, ¶ 24, 763 N.W.2d 761.

[¶17] To survive a void for vagueness challenge, laws require a degree of specificity:

> "A law is not unconstitutionally vague if: (1) the law creates minimum guidelines for the reasonable police officer, judge, or jury charged with enforcing the law, and (2) the law provides a reasonable person with adequate and fair warning of the prohibited conduct. A law is not unconstitutionally vague if the challenged language, when measured by common understanding and practice, gives adequate warning of the conduct proscribed and marks boundaries sufficiently distinct for fair administration of the law."

*State v. Moses*, 2022 ND 208, ¶ 17, 982 N.W.2d 321 (cleaned up). The required degree of specificity necessarily depends on the scope of the law and the conduct at issue. *Olson v. City of West Fargo*, 305 N.W.2d 821, 829 (N.D. 1981); *see also Texas Dep't of Ins. v. Stonewater Roofing, Ltd. Co.*, 696 S.W.3d 646, 660 (Tex. 2024) (stating the degree of vagueness that will be tolerated "depends in part on the nature of the enactment"); *Bartlow v. Costigan*, 13 N.E.3d 1216, 1225 (Ill. 2014) (stating the "test for determining vagueness varies with the nature and context of the legislative enactment"). We agree with the Colorado Supreme Court when it explained:

> "[T]he strictness of the vagueness test depends on whether the challenged law threatens to inhibit the exercise of constitutionally protected rights. When such constitutionally protected behavior may be inhibited, a greater degree of specificity is required than when a law does not implicate constitutionally protected liberties."

*Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 334 (Colo. 1994) (en banc) (citations omitted). The severity of a law's punishment also affects the degree of specificity required. Less specificity is constitutionally permitted when a statute imposes civil penalties, *Stonewater Roofing*, at 661, while more specificity is required when a statute imposes criminal penalties, *Bartlow*, at 1225.

[¶18] Through the enactments challenged here, it is indisputable the State is imposing restrictions on paramount aspects of its citizens' lives. *See State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358, 360 (N.D. 1995) (describing individual autonomy in medical decisions as a "fundamentally commanding" interest with "well-established legal and philosophical underpinnings"). Even putting patient autonomy aside, the plaintiffs' right to engage in their lawful profession—practicing medicine—also is significant. *See* N.D. Const. art. I, § 7 ("Every citizen of this state shall be free to obtain employment wherever possible . . . ."); *see also State v. Cromwell*, 9 N.W.2d 914, 918-19 (N.D. 1943) (describing the constitutional nature of "the right to follow one's individual preference in the choice of an occupation and the application of his energies"). Moreover, the conduct at issue encompasses more than simple commerce. Physicians are expected to apply their knowledge of medicine in a manner that will protect the health and lives of their patients. *See* N.D. Const. art. I, § 1 (declaring the right to defend life inalienable). Given the undisputable gravity of the conduct these statutes regulate, the specificity required by our Constitution is high.

[¶19] The criminal consequences a physician may suffer if he or she fails to conform his conduct to the law also are severe. *See* N.D.C.C. § 12.1-19.1-02 (stating violation of the law is punishable as a class C felony). If the plaintiffs violate the statute, they may be fined $10,000 and imprisoned for five years. N.D.C.C. § 12.1-32-01(4). Along with the obvious hardships that accompany a conviction and sentencing for the commission of a felony, the plaintiffs face the prospect of losing democratic rights. *See* N.D. Const. art. II, § 2 (felons prohibited from voting); N.D.C.C. § 12.1-33-01 (felons prohibited from running for or holding public office). They also face the prospect of losing their medical license, a certification they presumably obtained with much effort and expense. *See* N.D.C.C. § 43-17-31(1)(c); N.D.C.C. § 12.1-33-02.1 ("A person may be denied a

license, permit, certificate, or registration because of prior conviction of an offense if it is determined that such person has not been sufficiently rehabilitated, or that the offense has a direct bearing upon a person's ability to serve the public in the specific occupation, trade, or profession."). Their general reputation in the community also may suffer. *See State ex rel. Olson v. Langer*, 256 N.W. 377, 387 (N.D. 1934) ("[I]nfamy is a punishment as well as stigma on character."). The harsh punishment the plaintiffs face if they fail to conform their medical practice to the requirements of the law makes the degree of specificity required here very high.

[¶20] On preliminary review, it appears this law does not meet the high level of specificity our Constitution demands. The law uses terms that are by nature general and ambiguous, such as "reasonable," "prudent," and "knowledgeable." We acknowledge generalized language itself does not make a law unconstitutionally vague. *City of Belfield v. Kilkenny*, 2007 ND 44, ¶ 19, 729 N.W.2d 120. However, the difference in complexity between a law prohibiting conduct like "unreasonable noise" and one requiring a physician to use "reasonable medical judgment" cannot be denied. Nor can we ignore the fact that doctors may be required to make their medical judgments quickly, without the benefit of hindsight, and in the face of potentially grave if not deadly consequences for their patients. The law itself contemplates an abortion may be necessary care in difficult situations. N.D.C.C. § 12.1-19.1-03(1). Along with its general language, the law uses complex terms like "serious health risk" and "substantial physical impairment," yet the law provides no definition or guidance as to what these terms are supposed to mean. All of this is to say nothing about the main rationale for the district court's decision, which was that the law used "both subjective and objective elements" and "simply does not allow a physician to know against which standard his conduct will be tested and his liability determined." As a result, on our preliminary review we are not convinced the State is likely to succeed on this issue.

[¶21] The State contends it will succeed on the merits of this case based on the voluminous evidentiary record, which we have yet to thoroughly review. The State asserts the "undisputed evidence" shows the "Plaintiffs themselves understood the statute applied to the conduct they engage in." Although the State's motion for stay does not suggest the plaintiffs have brought an impermissible facial challenge, Justice Tufte aptly observes there is a difference between as-applied and facial constitutional challenges. Tufte, J., dissent, ¶ 58. However, if that is to be an issue, unlike our colleague, we are not convinced the plaintiffs lack standing to bring their claim.

[¶22] Our jurisprudence has recognized litigants may bring third-party facial vagueness challenges in the context of First Amendment rights. We have explained a litigant "must almost always demonstrate that the statute in question is vague as applied to his own conduct, without regard to its potentially vague application in other circumstances." *State v. Tibor*, 373 N.W.2d 877, 880 (N.D. 1985). In other words, "a party challenging the constitutionality of a statute must assert that the statute violates his constitutional rights, and not the rights of a third party." *Holbach*, 2009 ND 37, ¶ 25. This general prohibition applies unless "weighty countervailing policies" exist to justify third-party standing. *State v. Anderson*, 427 N.W.2d 316, 319 n. 1 (N.D. 1988) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). Third-party standing may exist when there is a "close relationship" between the rights of a litigant and third party, or when non-parties "stand to lose" by the outcome of a lawsuit but cannot preserve their rights, or when constitutionally protected speech is infringed. *Whitecalfe v. N.D. Dep't of Transp.*, 2007 ND 32, ¶ 18, 727 N.W.2d 779.

[¶23] When a litigant's claim is based on his or her own due process rights, we have decided whether a law is facially void for vagueness regardless of whether the claim implicates rights under the First Amendment to the United States Constitution. *See, e.g., Moses*, 2022 ND 208, ¶ 17 (possession of firearms by felons); *State v. Kordonowy*, 2015 ND 197, ¶ 19, 867 N.W.2d 690 (refusal to submit to chemical testing); *Simons v. Dep't of Human Servs.*, 2011 ND 190, ¶ 31, 803

N.W.2d 587 (child abuse); *State v. Brown*, 2009 ND 150, ¶ 35, 771 N.W.2d 267 (dog barking ordinance); *City of Fargo v. Salsman*, 2009 ND 15, ¶ 23, 760 N.W.2d 123 (nuisance); *City of Minot v. Boger*, 2008 ND 7, ¶ 7, 744 N.W.2d 277 (zoning ordinance); *Kilkenny*, 2007 ND 44, ¶ 28 (dog barking ordinance); *State v. Beyer*, 441 N.W.2d 919, 921-22 (N.D. 1989) (muffler requirement); *State v. Johnson*, 417 N.W.2d 365, 368-69 (N.D. 1987) (possessing explosives); *State v. Motsko*, 261 N.W.2d 860, 865 (N.D. 1977) (kidnapping); *State v. Hagge*, 211 N.W.2d 395, 398 (N.D. 1973) (negligent driving).

[¶24] We have rejected void for vagueness claims when the law is not constitutionally uncertain as applied to a challenger's own conduct. For example, in *State v. Tibor*, 373 N.W.2d at 879, a man challenged a gross sexual imposition law as being unconstitutionally vague. We reasoned the man could not advance "hypothetically unconstitutionally vague applications" based on conduct other than his own. *Id* at 881. We decided the man lacked standing because he had not demonstrated the law "is impermissibly vague as applied to him." *Id*. In *State v. Holbach*, 2009 ND 37, a man brought a vagueness challenge to a law criminalizing stalking. We noted he did not claim the law was vague as applied to his own conduct. *Id.* ¶ 22. We explained that, outside the First Amendment context, litigants cannot rely on "potentially vague application in other circumstances." *Id.* ¶ 25. We rejected his claim because "a reasonable person would know [his] conduct was prohibited by the statute." *Id.* ¶ 26. In *State v. Ness*, 2009 ND 182, 774 N.W.2d 254, a man was convicted for failing to tag a deer. He had transported the deer from the field and was butchering it when he was cited for violation of a hunting proclamation. *Id*. ¶ 9. He argued the proclamation's use of the word "immediately" was unconstitutionally vague. *Id*. We decided he lacked standing to bring such a challenge because, under the circumstances of his case, "a reasonable person would know" his conduct violated the law. *Id.* In *Interest of D.D.*, 2018 ND 201, 916 N.W.2d 765, a person who had been civilly committed challenged laws restricting the possession of firearms. He claimed the law was vague as to "what type of possession is required by the committed individual." *Id.* ¶ 15. We decided he lacked standing to argue whether the laws were "vague in other applications" because the law was not vague "as to his conduct." *Id.*

[¶25] The common thread in all these cases is that litigants generally lack standing to claim vagueness based on hypothetical third-party conduct. To that extent, we do not diverge from Justice Tufte's position that litigants generally cannot "challenge a statute as facially vague without a factual record to show that the statute is also vague as to that person's conduct." Tufte, J., dissent, ¶ 56. However, we do not agree there is no factual record in this case to support the plaintiffs' challenge. Based on the evidence submitted by the parties during discovery, the State contends no genuine issues of material fact exist and the district court should have granted summary judgment to the State as a matter of law.

[¶26] It appears largely undisputed that plaintiffs in this case practice medicine in North Dakota and provide the type of medical care implicated by the law. Our general prohibition on vagueness claims based on hypothetical third-party conduct therefore is not applicable here. The plaintiffs are asserting their own due process rights based on their own conduct. They claim the law impedes their ability to provide their patients care by subjecting them to "arbitrary or discriminatory prosecution." We see no reason why the plaintiffs cannot raise arguments about the law's adverse effect on their conduct. Their arguments are relevant to the nature of the injury they claim to have suffered or will suffer under terms of the law they challenge.

[¶27] The fact that the plaintiffs sued to challenge the law before the State charged them with a crime does not mean they lack standing. To have standing, a plaintiff must suffer a threatened or actual injury. *State v. Carpenter*, 301 N.W.2d 106, 107 (N.D. 1980). "When a person is subject to a criminal prosecution, or is faced with its imminent prospect, that person has clearly established the standing requirements to oppose the prosecution by asserting his relevant constitutional rights." *Id.*

[¶28] We have addressed pre-enforcement facial vagueness claims to other laws. For example, in *Olson v. City of West Fargo*, 305 N.W.2d at 822, bar owners brought a void for vagueness challenge to a "cabaret ordinance" that prohibited certain dancing in establishments where liquor is served. They faced suspension

or revocation of their liquor licenses if they failed to comply with the ordinance. *Id.* This Court expressly decided the ordinance "is not an unconstitutional infringement on free speech or expression." *Id.* at 827. The Court then addressed the plaintiffs' due process facial vagueness challenge and decided the language in the law was not unconstitutionally vague. *Id.* at 828-29. Another example is *Best Products Co. v. Spaeth*, 461 N.W.2d 91 (N.D. 1990), where shopkeepers brought a pre-enforcement due process void for vagueness challenge to a law requiring them to close on Sundays. This Court decided the vagueness claim on its merits and upheld the law, deciding the statute's language was "understandable to judges, juries, shopkeepers, and police officers." *Id.* at 100.

[¶29] The law currently before us criminalizes aspects of reproductive healthcare—conduct much weightier than dancing in bars or selling products and services on Sunday. In the context of state regulation of abortion since *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), other states have addressed due process void for vagueness challenges on the merits. *See, e.g., Planned Parenthood Great Northwest v. State*, 522 P.3d 1132, 1200-09 (Idaho 2023); *Oklahoma Call for Reproductive Justice v. Drummond*, 526 P.3d 1123, 1131-32 (Okla. 2023). Under the guidance of our precedent, consistent with our sister states, we believe the plaintiffs' due process void for vagueness claim is subject to consideration on appeal.

B

[¶30] The plaintiffs' second claim implicates third-party interests, namely whether the statute violates pregnant women's rights. The State argues it is likely to succeed on this issue because the district court did not correctly interpret our Constitution in light of its history and tradition, and thus did not give effect to the intent and purpose of the people adopting the constitutional provisions at issue.

[¶31] History may be examined to decide whether a right is fundamental under our Constitution. *See Wrigley I*, 2023 ND 50, ¶ 17 ("We may consider contemporary legal practices and laws in effect when the people adopted the constitutional provisions.") (quoting *MKB Mgmt. Corp. v. Burdick*, 2014 ND 197,

14

¶ 25, 855 N.W.2d 31). However, that is not our starting point. We need not resort to the historical record when the Constitution's language is clear. *See Thompson v. Jaeger*, 2010 ND 174, ¶ 7, 788 N.W.2d 586 ("The intent and purpose of a constitutional provision is to be determined, if possible, from the language itself.") (quoting *State ex rel. Heitkamp v. Hagerty*, 1998 ND 122, ¶ 13, 580 N.W.2d 139). Based on our history and tradition, we have already decided a pregnant woman in North Dakota "has a fundamental right to obtain an abortion to preserve her life or her health." *Wrigley I*, ¶ 40.

[¶32] In *Wrigley I* we explained:

> "North Dakota's history and traditions, as well as the plain language of its Constitution, establish that the right of a woman to receive an abortion to preserve her life or health was implicit in North Dakota's concept of ordered liberty before, during, and at the time of statehood. After review of North Dakota's history and traditions, and the plain language of article I, section 1 of the North Dakota Constitution, it is clear the citizens of North Dakota have a right to enjoy and defend life and a right to pursue and obtain safety, which necessarily includes a pregnant woman has a fundamental right to obtain an abortion to preserve her life or her health."

2023 ND 50, ¶ 27. "In sum, the history and traditions of North Dakota support the conclusion that there is a fundamental right to receive an abortion to preserve the life or the health of the mother." *Id.* ¶ 33.

[¶33] Having already addressed our history and tradition on this topic, we need not consult the historical record here. Whether this particular statute accords with general historical understandings on the topic of reproductive care is not part of our inquiry. To be clear, the State may restrict the exercise of a fundamental right, but when the State does so it "bears the burden of proving that such deprivation is narrowly tailored to a compelling state interest." *Hoff v. Berg*, 1999 ND 115, ¶ 9, 595 N.W.2d 285 (quoting *Petition of Santoro*, 578 N.W.2d 369, 374 (Minn. Ct. App. 1998)). While our estimation of the petitioner's likelihood of success on the merits in *Wrigley I* was preliminary, our interpretation of the North Dakota Constitution was not tentative. Our decision

interpreted the Constitution, and our interpretation was the baseline for evaluating the petitioner's likelihood of success on the merits of the issues. Our holding in *Wrigley I* similarly provides the baseline for our analysis here, which is strict scrutiny.

[¶34] Under strict scrutiny review, we are not convinced at this juncture that the challenged law falls within constitutional bounds. "'We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right . . . .'" *Haney v. N.D. Workers Comp. Bur.*, 518 N.W.2d 195, 197 (N.D. 1994) (quoting *Gange v. Clerk of Burleigh Cnty. Dist. Ct.*, 429 N.W.2d 429, 433 (N.D. 1988)). "The idea of strict scrutiny acknowledges that political choices burdening fundamental rights must be subjected to close analysis in order to preserve substantive values of equality and liberty." *Hoff*, 1999 ND 115, ¶ 16 (cleaned up) (quoting Laurence H. Tribe, *American Constitutional Law*, § 16-6, p. 1451 (2d ed. 1988)). A statute will not satisfy strict scrutiny "'unless it is shown that the statute promotes a compelling governmental interest . . . .'" *Gange*, at 433 (quoting *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621, 627 (N.D. 1977)). The statute also must be "narrowly tailored" to serve that interest. *Hoff*, ¶ 9. The burden is on the State to show both a compelling interest and narrow tailoring. *Id.*; *see also Hoffner v. Johnson*, 2003 ND 79, ¶ 41, 660 N.W.2d 909 (Maring, J., dissenting) ("Under our strict scrutiny standard of review, the burden is on the state to articulate a 'compelling governmental interest' that justifies the classification.").

[¶35] Although not established by our precedent, other state courts have concluded that statutes subject to strict scrutiny are presumed *unconstitutional*. *See, e.g., Hodes & Nauser v. Stanek*, 551 P.3d 62, 74 (Kan. 2024) (stating "the government's action is presumed unconstitutional, and the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it."); *BABE VOTE v. McGrane*, 546 P.3d 694, 708 (Idaho 2024) ("Strict scrutiny presumes legislation is unconstitutional unless the government can prove otherwise by establishing it is necessary to further a compelling interest."); *Norman v. State*, 215 So.3d 18, 36 (Fla. 2017) ("The law is presumptively unconstitutional."); *Magda v. Ohio Elections Comm'n*, 58 N.E.3d

16

1188, 1198 (Ohio Ct. App. 2016) (stating a law subject to strict scrutiny is "presumptively invalid").

[¶36] The law challenged in this lawsuit criminalizes abortions performed to treat psychological disorders that will cause a woman to engage "in conduct that will result in her death" or conduct that will result in "substantial physical impairment of a major bodily function." N.D.C.C. § 12.1-19.1-01(5). Under every other circumstance, the law allows abortions performed to save a woman from serious injury and death. N.D.C.C. § 12.1-19-03(1). The law's exception for injury and death caused by psychological maladies appears arbitrary. If the State's goal is to prevent unnecessary abortions and protect maternal health, this law does not appear narrowly tailored to achieve that aim within constitutional bounds. Therefore, the law is unlikely to survive strict scrutiny review because it criminalizes abortions necessary to prevent a woman from harming or killing herself.

C

[¶37] We turn to the other factors for deciding whether to grant a stay. The second, third and fourth factors considered when deciding whether to grant a stay pending appeal are whether the appellant will suffer an irreparable injury; whether a stay will cause any party substantial harm; and whether a stay will harm the public interest. *Aaland*, 2020 ND 196, ¶ 4.

[¶38] The State claims irreparable harm will occur if the law is not permitted to be enforced pending appeal of the district court's judgment. The plaintiffs respond by claiming they and pregnant women will be irreparably injured if the State's motion to stay the district court's judgment is granted. As we stated in *Wrigley I*, "[t]he death of unborn children and the potential death or injury of a pregnant woman are both tragic." 2023 ND 50, ¶ 35. We weigh these factors—whether there will be irreparable harm if the stay is not granted or if it is granted—neutral in considering whether to grant the State's request for a stay.

[¶39] The State argues a stay would serve the public interest because (1) upholding duly enacted statutes generally serves the public interest; (2) a stay

17

would offset the "raw judicial power" exercised by the district court; and (3) a stay would maintain the status quo. For the reasons we articulate below, we remain unconvinced that delayed enforcement caused by these judicial proceedings harm the public interest.

[¶40] Judicial review is part of our constitutional form of government. "The judiciary's proper function and duty is to say what the law is and what the Constitution means." *Grisham v. Van Soelen*, 539 P.3d 272, 285 (N.M. 2023) (cleaned up); *see also Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund*, 701 N.W.2d 440, 458 (Wisc. 2005) ("In short, neither our respect for the legislature nor the presumption of constitutionality allows for absolute judicial acquiescence to the legislature's statutory enactments. The court has emphasized that since *Marbury v. Madison*, it has been recognized that it is peculiarly the province of the judiciary to interpret the constitution and say what the law is."); *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). When courts are called on to decide whether a statute falls within the Constitution's outer boundaries, that exercise is neither the raw exercise of judicial power nor what some pundits and politicians suggest is a court "legislating from the bench." Rather, properly restrained judicial review of a statute is merely the fulfillment of our constitutional duty as a co-equal branch of the government.

[¶41] It also appears the law will not be enforced until we issue a final decision. The state's attorneys responsible for enforcing the law in Burleigh, Cass, Grand Forks, and Stark counties, where most of North Dakota's hospitals are located, stipulated in the district court to not enforce the law during the pendency of this lawsuit. These state's attorneys specifically agreed that, "[s]hould this [District] Court or a higher Court enter an order blocking enforcement of N.D.C.C. Chapter 12.1-19.1, or finding N.D.C.C. Chapter 12.1-19.1 violates the Constitution of the State of North Dakota, State's Attorney Defendants agree not to enforce N.D.C.C. Chapter 12.1-19.1, unless and until said order is vacated or overturned." In view of this stipulation, and because granting a stay will have little to no effect, we are not convinced the State has shown denial of a stay will

cause the public harm—much less irreparable or substantial harm. We weigh this factor against granting a stay.

[¶42] We decided this statute's predecessor was not the status quo. *Wrigley I*, 2023 ND 50, ¶ 38. That predecessor statute was repealed and N.D.C.C. ch. 12.1-19.1 was enacted. Shortly thereafter the plaintiffs amended their complaint to challenge N.D.C.C. ch. 12.1-19.1. This new law has never existed in an uncontested state, and we have located nothing in the record indicating the law has ever been enforced. Therefore, a stay of the district court's order declaring N.D.C.C. ch. 12.1-19.1 unconstitutional will not preserve the status quo.

V

[¶43] The motion for a stay pending appeal is denied.

[¶44] Daniel J. Crothers
Lisa Fair McEvers
Daniel D. Narum, D.J.

[¶45] The Honorable Daniel D. Narum, D.J., sitting in place of Bahr, J., disqualified.

**Tufte, Justice, dissenting.**

[¶46] I respectfully dissent.

I

[¶47] Resolution of this motion for stay pending appeal requires our preliminary consideration of an issue on which we have little precedent to guide us in interpreting the expansive terms of N.D. Const. art. I, § 1. The majority opinion in *Wrigley v. Romanick*, 2023 ND 50, 988 N.W.2d 231, has been cited as if it provides a holding on the ultimate merits question, including by the district court and the parties in their briefs requesting and opposing a stay. In *Wrigley*, this Court considered likely success on the merits in the context of a preliminary injunction. *Id.* ¶¶ 13, 39. Here, we decide the State's motion for a stay pending

19

appeal, again addressing not the ultimate question on the merits but only the *likelihood* of success on the merits.

[¶48] The first factor for granting a stay is similar to the first factor for granting an injunction. *See Cass Cnty. Joint Water Res. Dist. v. Aaland*, 2020 ND 196, ¶ 4, 948 N.W.2d 829 ("a strong showing that the appellant is likely to succeed on appeal"); *Wrigley*, 2023 ND 50, ¶ 12 ("substantial probability of succeeding on the merits"). But the required probability of success on the merits is lower for a stay than for an injunction. *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (explaining that a request for an injunction "'demands a significantly higher justification' than a request for a stay, because unlike a stay, an injunction 'does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts'" (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers))); *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)) (explaining that party seeking injunction "does not need to 'prove a greater than fifty per cent likelihood that it will prevail on the merits'"). Both forms of relief are intended to preserve the status quo pending final resolution of the merits at trial or on appeal. *Wrigley*, 2023 ND 50, ¶ 38; N.D.R.Civ.P. 62(l). And in both instances, a court's decision on a preliminary injunction or stay does not bind it in later decisions. *F-M Asphalt, Inc. v. N.D. State Hwy. Dep't*, 384 N.W.2d 663, 665 (N.D. 1986) (applying *Dataphase* factors and explaining that conclusion on likely success factor "does not reflect any view on the final disposition of this matter"); *see Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (determinations made in order granting stay pending appeal "are for that purpose and do not bind the merits panel").

[¶49] Just as injunctions are decided before trial on the merits, we decide a stay pending appeal on the basis of limited briefing and a shorter timeline. Because the only issue before us now is likely success on the merits, we make no controlling precedent on the ultimate merits question. *City of Bismarck v. McCormick*, 2012 ND 53, ¶ 14, 813 N.W.2d 599 ("A prior opinion is only stare decisis on points decided therein; any expression of opinion on a question not

20

necessary for decision is merely dictum, and is not, in any way, controlling upon later decisions."). All five members of the Court in *Wrigley* expressed agreement there was a likelihood the Court would conclude on the merits that a statute lacking an exception for the life of the mother or "when necessary to prevent severe, life altering damage" was inconsistent with article I, section 1. *Wrigley*, 2023 ND 50, ¶¶ 31–33, *id.* ¶¶ 42–44 (Tufte, J., concurring). But we did not decide the merits in *Wrigley*, and we do not decide the merits on this motion for a stay.

[¶50] The discussion below reflects my preliminary analysis of the issues on the basis of the record below and the briefing on the motion for stay. Any conclusions by the Court or any individual justice are of course subject to reconsideration in light of new arguments and authority in the parties' appellate briefing and at oral argument.

II

A

[¶51] A simple majority of this Court lacks the power to declare a legislative enactment unconstitutional—the Court may do so only if "at least four of the members of the court so decide." N.D. Const. art. VI, § 4. If agreed to by four members of the Court, such a declaration is indefinite—it has no fixed end date and is potentially permanent—but it may not be permanent because courts of last resort occasionally reconsider constitutional decisions. *See Roe v. Wade*, 410 U.S. 113 (1973), *and Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003). This Court's denial of a stay results in the statute being unenforceable during the pendency of the appeal.[1] Our ultimate decision on this appeal has no date

---

[1] The statute would be temporarily unenforceable, but not repealed. *See* Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 935–36 (2018) ("[C]ourts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited: It permits a court to decline to enforce a statute in a particular case or controversy, and it permits a court to enjoin executive officials from taking steps to enforce a statute—though only

certain. The oral argument on the merits is months away. A decision in a weighty constitutional case may take several months after argument. For example, this Court did not decide a 2013 abortion case until thirteen months after the case was submitted to the Court. *MKB Mgmt. Corp. v. Burdick*, 2014 ND 197, 855 N.W.2d 31 (argued Dec. 11, 2013; mandate issued Jan. 13, 2015).

[¶52] By declining to grant a stay, this Court leaves in place the district court's judgment, resulting in suspension of enforcement of the challenged statutes as if they were void for a period of at least several months. But courts don't turn statutes on and off or erase them from code books. This Court's power to preclude enforcement of a statute requires a declaration that it is in conflict with the constitution or was enacted in violation of required constitutional procedure. *Bd. of Trs. of N.D. Pub. Emps. Ret. Sys. v. N.D. Legis. Assembly*, 2023 ND 185, 996 N.W.2d 873; *Tooz v. State*, 76 N.D. 599, 38 N.W.2d 285, 290–92 (N.D. 1949). Denying a stay here has the effect of suspending enforcement of the statute until an uncertain future date when this Court renders final judgment on the merits. It is not clear whether a simple majority of three members of this Court has that power.

B

[¶53] Likelihood of success on the merits logically must factor into the vote required to achieve success. *See Hollingsworth v. Perry*, 558 U.S. 183, 190–91 (2010)

---

while the court's injunction remains in effect. But the statute continues to exist, even after a court opines that it violates the Constitution, and it remains a law until it is repealed by the legislature that enacted it.") If this Court issues a decision on the merits in which fewer than four members of the Court agree with the facial challenge, that would repudiate the district court's decision and again permit enforcement of N.D.C.C. ch. 12.1-19.1 in state courts. There is no obvious reason why enforcement after such a decision could not reach conduct that occurred during the pendency of the appeal. *See generally* Mitchell, *supra* at 938 ("All the injunction does is prevent the named defendants from *enforcing* that law while the court's injunction remains in place. That does not confer immunity or preemptive pardons on those who violate the statute. And it does not prevent the enjoined officials from enforcing the law against those who violated it if the injunction happens to be dissolved on appeal or after trial."). The risk that some may misunderstand the district court's order as striking down the challenged statutes and functionally repealing them counsels in favor of this Court granting a stay. By failing to grant the stay pending appeal, the Court invites action in reliance on the mistaken assumption that the statutes have been invalidated. No statute may be declared invalid until four members of this Court have reached that conclusion.

(distinguishing likely success at certiorari stage, requiring four votes, from likely success on a petition for a writ, requiring a majority). Where two justices conclude the State is likely to succeed on the merits and the enactment will not be declared unconstitutional, a vote of three justices to temporarily maintain a district court's judgment enjoining enforcement of the legislation is a confident prediction that one of the two justices will change positions. But this prediction is against the odds: assuming each member of the Court is equally likely to change positions, the odds are 3:2 that a justice changing positions will be one of the three rather than one of the two. At this preliminary stage we appear to have a good-faith disagreement, and any one of us may update our views upon full briefing and argument. In my view, this situation calls for a courtesy vote. In the U.S. Supreme Court, it has been a common practice for a justice to vote for a stay that the justice disagrees with as a courtesy to other justices holding an opposing view. *See, e.g.*, *Arthur v. Dunn*, 580 U.S. 977 (2016) (Roberts, C.J.) (providing a fifth vote to grant a stay in a capital case "as a courtesy" to four justices who had voted for a stay); *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 579 U.S. 961 (2016) (Breyer, J., concurring) (providing fifth vote for a stay of district court order "as a courtesy" pending a decision on petition for certiorari).

III

[¶54] The district court concluded N.D.C.C. ch. 12.1-19.1 is void for vagueness. A threshold issue that the district court did not directly address is whether the Red River Women's Clinic (RRWC) is permitted to bring a vagueness challenge to N.D.C.C. ch. 12.1-19.1. RRWC brought a facial challenge to N.D.C.C. ch. 12.1-19.1, and the court concluded "the law is impermissibly vague on its face[.]" The court described the claim as an as-applied challenge based on speculative facts and cancelled the trial.

[¶55] We have limited void-for-vagueness challenges not implicating First Amendment rights to as-applied challenges. *State v. Tibor*, 373 N.W.2d 877, 880 (N.D. 1985) ("To have standing to raise a vagueness challenge, a litigant must almost always demonstrate that the statute in question is vague as applied to his

23

own conduct, without regard to its potentially vague application in other circumstances."). This Court has held:

> The parties must have standing to litigate the issues before a court may decide the merits of a dispute. Generally a party challenging the constitutionality of a statute must assert that the statute violates his constitutional rights, and not the rights of a third party. When a party is challenging a criminal statute arguing it is vague and provides a lack of notice, unless the statute threatens First Amendment interests the challenge may be overcome when a reasonable person would know that their conduct is at risk; therefore the statute must be reviewed as it applies to the particular facts in the case. To have standing to raise a vagueness challenge, a litigant must almost always demonstrate that the statute in question is vague as applied to his own conduct, without regard to its potentially vague application in other circumstances. However, a party may challenge a statute arguing it is unconstitutionally vague if the statute regulates or prescribes [*sic*] speech protected by the First Amendment.

*State v. Holbach*, 2009 ND 37, ¶ 25, 763 N.W.2d 761 (cleaned up); *accord State v. Anderson*, 427 N.W.2d 316, 319 n.1 (N.D. 1988) (citing First Amendment cases as exceptions to the proposition that a litigant has standing to challenge a statute only as to his own conduct, unless there are "weighty countervailing policies" to justify third-party standing). The parties have not cited authority or cogently argued that a vagueness challenge under the due process clause of N.D. Const. art. I, § 12 is subject to different analysis than a vagueness challenge under the Fourteenth Amendment.

[¶56] Our decisions are consistent: only if a statute implicates First Amendment rights may a person challenge a statute as facially vague without a factual record to show that the statute is also vague as applied to that person's conduct. Subject to that narrow exception, our decisions resolving facial vagueness challenges uniformly reflect a factual record of the challenger's conduct that led to enforcement of the challenged statute. *See, e.g., State v. Moses*, 2022 ND 208, ¶ 17, 982 N.W.2d 321; *Simons v. State, Dep't of Hum. Servs.*, 2011 ND 190, ¶ 29–32, 803 N.W.2d 587; *Best Prods. Co. v. Spaeth*, 461 N.W.2d 91, 100 (N.D. 1990) ("Because

24

this statute is not vague in all its applications and because challengers are not themselves being prosecuted for allegedly vague applications of the law, Challengers' argument fails."). The State is likely to succeed on its appeal of the district court's conclusion that N.D.C.C. ch. 12.1-19.1 is facially void for vagueness.

## IV

[¶57] The district court's fundamental rights analysis contains several legal errors that significantly undermine its likelihood of being affirmed on appeal by the required constitutional supermajority.

## A

[¶58] The district court misapplied the law for facial challenges. The court correctly rejected the RRWC's framing of their challenge as an "as-applied challenge supported by speculative facts." It properly concluded this is a facial challenge that does not depend on any adjudicative facts for resolution. The court then misapplied our law for facial challenges. We recently summarized our jurisprudence on constitutional challenges:

> Challenges to the constitutionality of a statute may be "facial" challenges or "as-applied" challenges. A claim that a statute on its face violates the constitution is a claim that the Legislative Assembly exceeded a constitutional limitation in enacting it, and the practical result of a judgment declaring a statute unconstitutional is to treat it as if it never were enacted. An "as-applied" challenge, on the other hand, is a claim that the constitution was violated by the application of a statute in a particular case. Generally, a party may only challenge the constitutionality of a statute as applied to that party.

> When both an as-applied challenge and a facial challenge are raised, we generally first consider the narrower as-applied challenge. As a general rule a court will inquire into the constitutionality of a statute only to the extent required by the case before it and will not anticipate a question of constitutional law in advance of the necessity of deciding it, and will not formulate a rule

25

of constitutional law broader than is required by the precise facts to which it is to be applied.

*City of Fargo v. State*, 2024 ND 236, ¶¶ 11–12 (cleaned up).

[¶59] This is a facial challenge to a criminal statute, N.D.C.C. ch. 12.1-19.1. RRWC raises a claim the legislation is unconstitutionally vague (a type of due process claim) and a claim the legislation violates their rights under N.D. Const. art. I, §§ 1 and 12. No claim is raised under the First Amendment to the U.S. Constitution, and yet RRWC relies on overbreadth and "chilling effect"— doctrines that we have not applied outside the First Amendment. RRWC cited no cases outside the First Amendment context in which we have applied overbreadth doctrine or relied on a chilling effect to find a statute facially invalid. In its brief in support of its motion for summary judgment, the State asserted RRWC's claims were overbreadth claims. The amended complaint refers five times to "chilling" constitutionally protected activity. "An overbreadth challenge is unusual." *United States v. Hansen*, 599 U.S. 762, 769 (2023). Overbreadth doctrine is justified because "it provides breathing room for free expression" from laws that "may deter or 'chill'" free speech. *Id.* at 769–70 (cleaned up). RRWC relies on doctrine we have never before applied outside the First Amendment, without any cogent argument that the doctrine's rationale applies in this context. The district court's reasoning that the law "can have a profound chilling effect on the willingness of physicians to perform abortions" applies the logic of overbreadth doctrine beyond its free speech rationale to hypothetical scenarios and thus likely misapplies the law. "The adjudication of the constitutionality of a statute when there is only merely a potential for impairment of constitutional rights would result in an advisory opinion." *State v. Anderson*, 2022 ND 144, ¶ 11, 977 N.W.2d 736.

B

[¶60] The district court misapplied settled rules of constitutional interpretation. Since 1889 this Court has consistently sought to determine the original public meaning when interpreting the meaning of our state constitution. *See generally* Jerod E. Tufte, *The North Dakota Constitution: An Original Approach Since 1889*, 95

N.D. L. Rev. 417 (2020). As a matter of interpretive principle and in recognition of this Court's limited role in a system of separated powers under the rule of law, we must accept that a statute or constitutional provision has an identifiable meaning at the time of its enactment and it must continue to carry that same meaning—to articulate the same legal rule or standard—until it is properly amended. *Id.* at 428–38. The facts to which a rule applies may change, but the meaning of rules enacted into law does not. The leading jurist and scholar of state constitutions at the time our constitution was written and adopted explained it this way:

> A Constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written Constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion.

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 67 (5th ed. 1883). To a non-lawyer, a change in the Court's understanding or interpretation, based on different arguments or circumstances that highlight previously unappreciated nuances, may seem like a change in the law. But properly understood, when the Court interprets a text, it declares the meaning of that text at all times. *State v. McGinnis*, 2022 ND 46, ¶ 14, 971 N.W.2d 380; *Garcia v. State*, 2017 ND 263, ¶ 21, 903 N.W.2d 503. If it were otherwise, and the Court purported to change an enacted text through interpretation, then it would usurp the role of the Legislative Assembly or of the People to exercise legislative power.

[¶61] The district court contended that "there was a time when we got it wrong" and "the sentiments of the past, alone, need not rule the present for all time." The court relied extensively on *State v. Cromwell,* 72 N.D. 565, 9 N.W.2d 914 (1943), to support its fundamental rights analysis under N.D. Const. art. I, § 1, premised on the pursuit of happiness. *Cromwell* was a criminal case involving a conviction for practicing photography without a license. *Id.* at 915. In declaring

27

the occupational licensing statute unconstitutional, the Court said the right to pursue happiness guaranteed in section 1 is "one of the most comprehensive to be found in the constitutions." *Id.* at 919 (quoting Black, *Constitutional Law*, § 145). Discussing the nature of the liberty and pursuit of happiness rights described in section 1, the Court went well beyond the licensing statute at issue in the case, stating the rights "must comprise personal freedom, exemption from oppression or invidious discrimination, the right to follow one's individual preference in the choice of an occupation and the application of his energies, liberty of conscience, and the right to enjoy the domestic relations and the privileges of the family and the home." *Id.* at 918–19. This sweeping dictum is inspiring, but it provides little assistance to this Court in identifying a conflict between the challenged statute and the state constitution.

[¶62] The district court also quotes what may be the most anti-canonical statement in any case involving the North Dakota Constitution:

> The Constitution is a living, breathing, vital instrument, adaptable to the needs of the day, and was so intended by the people when adopted. It was not a hard and fast piece of legislation, but a declaration of principles of government for the protection and guidance of those upon whose shoulders the government rested.

*State v. Norton*, 64 N.D. 675, 255 N.W. 787, 792 (1934). Reading the *Norton* opinion as a whole, it is hard to miss that the Court in *Norton* was attempting to interpret the North Dakota Constitution according to its original meaning *at* the time the provision at issue was enacted—not as a "living, breathing" document, the meaning of which changes with changing social views or medical advances. Quoting *Barry v. Truax*, 13 N.D. 131, 99 N.W. 769 (N.D. 1904), the Court interpreted the right to a jury trial to include all elements "as they were known to and understood by the framers of the Constitution and the people who adopted it." *Norton*, 255 N.W. at 788. Citing *Power v. Williams*, 53 N.D. 54, 205 N.W. 9 (1925), the Court stated that "we reviewed the scope of this right as it existed at the time of the adoption of the State Constitution," seeking the conception "which the Constitutional Convention of this state had in mind." *Id.* at 788–89. The Court considered prior legislative and judicial interpretations to

28

have "persuasive force" despite not squarely confronting the constitutional question. *Id.* at 790. To interpret the scope of a right which must "remain inviolate," the Court has to consider not what it means now (when the Court applies the provision), but in the past tense: "Trial by jury *meant* a unanimous decision of twelve persons of the same class as the defendant." *Id.* at 791 (emphasis added). It was not the Court's constitutional interpretation that was adapted to the times, but legislation: "Legislation must of necessity take into consideration the change in conditions and, in applying the established principles to these changes, must make changes in the application from time to time." *Id.* Interpretation of the constitution sought the meaning of "the people of that day." *Id.*

[¶63] The *Norton* Court emphasized again and again its aim was to determine the constitution's meaning according to what it meant to the people at the time the provision was adopted. The paragraph containing the passage quoted by the district court makes the point multiple times:

> We do not believe *the constitutional convention, or the people, when they adopted the Constitution*, thought of the jury in any other sense than a jury of the peers and that the real meaning and purpose would have been exemplified as well had the constitutional provision said "the jury in civil cases, in courts not of record, may consist of less than twelve, as may be prescribed by law," leaving out the word "men." *What the convention had in mind, and what the people had in mind*, was a jury of twelve electors and the convenience and economy of a lesser number of jurors in the courts of justice of the peace and other courts not of record. *We interpret the word "men" in the thought of the convention and of the people of the day* as meaning those persons who possessed the qualifications of jurors *at that time*, with no thought of sex. The Constitution is a living, breathing, vital instrument, adaptable to the needs of the day, and was so intended by the people when adopted. It was not a hard and fast piece of legislation, but a declaration of principles of government for the protection and guidance of those upon whose shoulders the government rested.

*Id*. at 792 (emphasis added).

[¶64] This Court has never applied the "living, breathing" constitution dictum, not in *Norton*, and not since. The district court erred when it misapplied this Court's longstanding and consistent interpretive principles.

C

[¶65] We interpret the provisions asserted by RRWC according to the ordinary meaning of those provisions as understood by the enacting public. *Sorum v. State*, 2020 ND 175, ¶¶ 19–20, 947 N.W.2d 382. Interpreted according to this uniform standard, the historical evidence shows these provisions were not understood to encompass a fundamental right to abortion. Under our longstanding principles of interpretation, RRWC must establish that the ordinary meaning of our constitution includes a fundamental right to an abortion that conflicts with this exercise of the state's otherwise "broad and comprehensive" police power to "promote the public health, morals, and safety." *State v. Riggin*, 2021 ND 87, ¶ 14, 959 N.W.2d 855.

[¶66] In their amended complaint, RRWC cites only N.D. Const. art. I, §§ 1 and 12, as the basis for right to life and safety claims for relief. In section 1, the terms "enjoying and defending life and liberty" and "pursuing and obtaining safety and happiness" are broad enough on their face to support RRWC's constitutional claim. But because "enjoying . . . liberty" and "pursuing . . . happiness" are broad enough to implicate a vast array of laws, we must consider the relevant history and context to interpret these provisions and determine what limits they impose on the State's otherwise broad and comprehensive police power. If RRWC's claim is correct, then any statutes regulating abortion were impliedly repealed either in 1889 when the constitution was adopted or in 1984 when section 1 was amended. *State v. Strom*, 2019 ND 9, ¶ 8, 921 N.W.2d 660. To determine whether the ordinary meaning of this provision in 1889 or in 1984 would have encompassed a right to abortion, we may also consider other evidence of how the people who made these words part of our fundamental law would have understood the words they enacted. *Newman v. Hjelle*, 133 N.W.2d 549, 555–57 (N.D. 1965) (considering newspaper advertisements, publicity pamphlets, and statutes in effect as evidence of how the framers and the people

30

who adopted a provision understood it). We have previously considered state and territorial statutes as relevant context for understanding the meaning of section 1. *Wrigley*, 2023 ND 50, ¶¶ 23–24; *MKB Mgmt.*, 2014 ND 197, ¶¶ 36–37. That discussion remains relevant when we reach the question on the merits.

1

[¶67] The dispute here is primarily one of legislative fact, not adjudicative fact. Adjudicative facts are the specific facts about what happened in a particular case—the *who*, *what*, *when*, *where*, and *why* that relate to the immediate parties in the dispute. *Little v. Traynor*, 1997 ND 128, ¶ 12, 565 N.W.2d 766. Such facts are unique to the case at hand and are typically proven through witness testimony, documents, and other evidence presented at trial. *Id.* Legislative facts, on the other hand, are general facts that help the court determine the content and application of law and policy. *Id.* Trial and appellate courts may establish legislative facts through expert testimony, academic research, or other secondary sources without resorting to judicial notice. *Edison v. Edison*, 2023 ND 141, ¶ 34, 994 N.W.2d 151; Explanatory Note to N.D.R.Ev. 201 ("Judicial notice of legislative facts, facts that aid the court in the interpretation and application of law and policy, is not governed by this or any other rule of evidence.").

[¶68] The State supported its summary judgment motion with a declaration attaching various expert reports and deposition transcripts, including those of Dr. Karissa Haugeberg, a historian who offered evidence in support of legislative facts relating to abortion at or around statehood. Her research included historical North Dakota newspapers; The Journal-Lancet, the medical journal of record for Minnesota, North Dakota, and South Dakota until 1968; and peer reviewed book monographs and scholarly articles about the history of North Dakota, maternal mortality, and the histories of birth control and abortion. Although experts may help courts determine historical legislative facts, the court may do its own review of historical references and other secondary sources to shed light on the meaning of terms. *See McCormick*, 2012 ND 53, ¶ 12; *Newman*, 133 N.W.2d at 555–57; *see also D.C. v. Heller*, 554 U.S. 570 (2008) (interpreting constitutional terms where

31

both the majority and dissent considered a variety of historical sources to provide relevant evidence of meaning in context).

2

[¶69] Newspapers from the period just before the vote to approve the state constitution and published in the territory that became North Dakota on November 2, 1889, regularly reported on criminal prosecutions for abortion and consistently referred to abortion as a crime. Under the heading *The World of Criminals*, the Emmons County Record reported on August 2, 1889, about a "Joseph Howell, charged with causing the death of his paramour, Malinda Hall, by abortion." On July 19, 1899, the Griggs County Courier reported the death of a "school girl aged sixteen . . . from the effects of an abortion," along with the arrest of two people implicated in the crime. *See also* Wahpeton Times, July 18, 1889 (reporting same events). In the June 27, 1889 edition, the Wahpeton Times reported the arrest of a man charged in relation to a death "from the effects of attempted abortion." The Bismarck Tribune edition of May 17, 1889, reported news of the missing Dr. Cronin, describing the confession of another man providing details of "a woman killed by abortion, perhaps performed by Dr. Cronin." Further reinforcing the consistent association of abortion with criminality, on April 25, 1889, the Wahpeton Times reported on Canadian legislation, stating that "the bill includes murder, counterfeiting, forgery, larceny, embezzlement, obtaining money on false pretenses, rape, abduction, burglary, arson, piracy, abortion, breach of trust, and any offense construed as felony by Canadian laws." The March 15, 1889 Oakes Republican reported news of a physician arrested on the basis of a "death bed statement" that he had performed a criminal abortion on the decedent.

[¶70] Although many reports of abortion close in time to the adoption of the constitution involved criminal charges following the death of the pregnant woman, the public discussion of abortion was not limited to abortions that caused death of the pregnant woman. In January 1885, newspapers across the territory reported the arrest of Dr. Bradley and Sarah Highland, defendants in an abortion case in Lisbon. *See, e.g.*, Bismarck Weekly Tribune, Jan. 23, 1885, at 1;

The Wahpeton Times, Jan. 29, 1885, at 2; Jamestown Weekly Alert, Jan. 29, 1885, at 2; The Pioneer Express, Jan. 30, 1885, at 1 (Pembina). Bradley was accused of committing abortion on Highland. Both failed to post bond and were committed to the Cass County Jail. The Jamestown newspaper reported in detail under the heading *Crime Against Humanity* about court proceedings relating to abortion charges against Dr. DePuy. Jamestown Weekly Alert, Aug. 8, 1884, at 4. The woman on whom the abortion was performed testified extensively and wrote in a letter about her desperate circumstances of being young, unmarried, and betrayed by the man who had promised to marry her. Jamestown Weekly Alert, Aug. 15, 1884, at 4. Another report described an Iowa case in which "[t]he crime was revealed by chance while the girl was testifying" in another matter. The Hope Pioneer, Apr. 25, 1884, at 2. Finally, the Bismarck Weekly Tribune reported on the arrest of a Denver abortionist and pending arrest warrants for "three married couples" charged with being patrons of the abortionist Madame Astle. Bismarck Weekly Tribune, Sep. 4, 1891, at 2.

[¶71] The reported cases are consistent with the news accounts. In *State v. Longstreth*, 19 N.D. 268, 121 N.W. 1114 (N.D. 1909), the Court addressed Dr. Longstreth's appeal from a conviction for abortion. The Court was divided on whether sufficient evidence was presented to prove the abortion was not necessary to preserve the life of the woman. *Id.* at 1119. The prosecution had presented testimony from the woman that she had become pregnant by Dr. Longstreth and he had employed drugs and a medical instrument on her to induce abortion without ever telling her that an abortion was necessary to preserve her life. *Id.* at 1118. The majority noted, but did not resolve, a division of authority on the proof required to establish whether the abortion was necessary to save the woman's life: "Under a statute which makes it an element of the offense that the abortion was not necessary, some courts hold that, though this want of necessity must be averred in the indictment, it need not be proved; but the burden is on the defendant to show a necessity." *Id.* at 1118 (quoting Bishop, Commentaries on the Law of Statutory Crimes § 762 (3d ed. 1901)).

[¶72] Whether the State is likely to succeed on appeal depends on whether the "plain, ordinary, and commonly understood meaning" of N.D. Const. art. I, § 1,

includes a right to abortion broad enough to conflict with N.D.C.C. ch. 12.1-19.1. *Thompson v. Jaeger*, 2010 ND 174, ¶ 7, 788 N.W.2d 586. The territorial laws in effect in 1889, the frequent newspaper references to criminal prosecution for abortion, and the multiple references to death by suicide of a doctor accused of committing abortion all indicate the ordinary meaning of section 1 was not understood to limit regulation of abortion. *See, e.g.*, Oakes Republican, Mar. 15, 1889 (reporting arrest of physician for abortion who then "died very suddenly under circumstances indicating suicide"); Griggs Courier, Dec. 21, 1888 (reporting arrest "on the charge of procuring an abortion" of Dr. G. Williams, who was found dead the next day "having taken arsenic"). There is no indication of public debate about decriminalizing abortion or guaranteeing a right to abortion leading up to adoption of the 1889 constitution. All known evidence of the original meaning is that the people of North Dakota in 1889 did not understand section 1 to raise a conflict with the existing restrictions on abortion.

3

[¶73] The *Wrigley* majority and RRWC cited the 1914 edition of The Journal-Lancet as providing some support for a right to abortion to preserve life or health. *Wrigley*, 2023 ND 50, ¶ 25. The material was published 25 years after the 1889 constitution was adopted, so it is of limited value in assisting in the interpretation of language enacted much earlier. Even with that caveat, read as a whole, the 1914 medical journal fails to support the broad health-preserving right asserted by RRWC. Moreover, upon review of related medical journals from the 1880s through the 1910s, it becomes clear that the medical consensus during that period, which spans the adoption of the 1889 constitution, was that inducing an abortion was a last resort to be tried only if all other measures had failed, the mother was all but certain to die if the pregnancy continued, and more than one physician was consulted. To be clear, I do not believe the people of North Dakota intended to codify prevailing medical practices in the broad natural rights declaration of art. I, § 1. But the medical journals as a whole significantly undercut RRWC's argument that the original meaning of the provision was understood by the enacting public to embody a right to abortion broad enough to conflict with N.D.C.C. ch. 12.1-19.1. As discussed below, the

medical literature is consistent with a narrower right to preserve the life of a pregnant woman when she would be in grave danger by continuing the pregnancy.

[¶74] In 1880, William Potter, M.D., wrote for the American Journal of Obstetrics about the artificial induction of abortion. William Warren Potter, M.D., *On Rectal Alimentation and the Induction of Abortion for the Relief of the Obstinate Vomiting of Pregnancy* (1880). Dr. Potter disagreed with another doctor who had recently written that artificial abortion for relief of gravid nausea could be eliminated entirely, "even as a last resort." *Id.* at 13. Potter contended it would be unwise to completely banish abortion in these cases "even though it can only be justified as a measure of last resort." *Id.* He concluded, "in cases which have resisted the employment of all milder expedients, and life still seems threatened, the induction of abortion for the relief of the excessive, obstinate, and uncontrollable vomiting of pregnancy, becomes an alternative measure justifiable, alike, by medicine and morals." *Id.* at 16.

[¶75] Similarly, in 1891, E.S. McKee, M.D., wrote for the American Journal of Obstetrics:

> The indications for the induction of abortion are well presented by Parvin. He finds it sometimes necessary in diseases of the kidneys, though prophylactic measures will generally suffice. The same is true of chronic heart disease [a]nd diseases of the respiratory organs. Chorea is an indication in cases where the life of the mother is jeopardized and other remedies fail. Eclampsia is infrequently an indication. Cancer of the rectum is occasionally so, as is also mammary cancer and severe cases of rheumatism.

E.S. McKee, M.D., Abortion, at 5 (1891).

[¶76] In the 1889 Journal of the Minnesota State Medical Society, James H. Dunn, M.D., reported several cases, including one patient who "had been treated for pernicious vomiting of pregnancy, and abortion at last advised." Transactions of the Minnesota State Medical Society, at 80 (1889). In 1890, the Journal reported: "No woman who has disease of the kidneys should be allowed to become

35

pregnant, and if she does her physician would be *almost* justified in producing an early abortion, for the chances would be very much against her carrying a child to full term without having puerperal convulsions." Transactions of the Minnesota State Medical Society, at 12 (1890) (emphasis added). In 1891, the Journal reported: "The question here naturally arises, is it justifiable to produce an abortion artific[i]ally, in the early months, or for that matter, at any time during the pregnancy of a woman known to be syphilitic? This must be answered in the negative, for, small as the chances are for a healthy offspring, they should be taken." Transactions of the Minnesota State Medical Society, at 147 (1891).

[¶77] In 1906, the Journal described abortion as having three classifications:

> Abortion falls under three heads:
> 1. Accidental, when caused by a fall, or a blow, or a specific disease of the mother or ovum.
> 2. Lawful, when the physical condition of the mother is such that gestation would seriously threaten her life; for example, a badly deformed pelvis, the last stage of chronic alubuminuria [sic], or the last stage of tubercular consumption.
> 3. Criminal, when the object sought is the death of the vitalized ovum, thus preventing its growth to maturity.
> [ . . . ]
> I wish to make more emphatic by repetition that an abortion is only justified when pregnancy or childbirth seriously threatens the life of the mother.

Transactions of the Minnesota State Medical Society, at 443, 446 (1906).

[¶78] The passage from the 1914 Journal quoted in *Wrigley* comes from an *editorial* entitled *Criminal Abortions*. The Journal-Lancet, The Journal of the Minnesota State Medical Association and Official Organ of the North Dakota and South Dakota State Medical Associations, at 82, 665 (1914). Read in context, the reference to the "mentally unfit who might become deranged" is not an endorsement of abortion to treat or to preserve the mental health of a pregnant woman. *Id.* at 82. The editorial strongly advocates that abortionists "be stamped out" and "honest and conscientious doctors absolutely decline to perform abortions unless from humanitarian reasons." *Id.*

[¶79] The closer in time a reference is to the date of enactment, the more assistance it may provide in understanding the meaning of the words and phrases in the proper context. On my review of the district court record and of additional news and medical references of the same type relied on by RRWC's expert, the original public meaning of art. I, § 1, did not encompass a right to abortion when not medically necessary to avoid a serious threat to the mother's life or physical health.

4

[¶80] The district court recognized that the original meaning of N.D. Const. art. I, § 1 was not understood by the enacting public in 1889 as including a right to abortion. The court stated it "can comfortably say that the men who drafted, enacted, and adopted the North Dakota Constitution, and the laws at that time, likely would not have recognized the interests at issue in this case." As a result, the court reasoned that the 1984 amendment to art. I, § 1, expanded the rights of women relevant to the issues here.

[¶81] RRWC argues this amendment, which changed the word "men" to "individuals," "clarif[ies] that these rights extend equally to people of all genders" and thus inferentially supports its argument that section 1 guarantees a right to terminate a pregnancy. This argument fails for several reasons.

[¶82] First, this single-word change was not a freestanding amendment but instead was included in an initiative intended to expressly protect the right to bear arms. 1985 N.D. Sess. Laws ch. 702. This context raises an obvious question: Why would the people amend section 1 to add the right "to keep and bear arms for the defense of their person, family, property, and the state" when section 1 already protected the "inalienable right[] . . . of enjoying and defending life and liberty"? The right to defend life and liberty implies the right to keep and bear the tools necessary for that task. The desire for explicit protection of arms suggests the people understood that these broad phrases by themselves may not be specific enough to guarantee particular rights. By comparison, inferring a right to abortion from the broad provisions "enjoying and defending life and

37

liberty" and "pursuing and obtaining safety and happiness," would require a far more attenuated interpretive leap.

[¶83] Second, the amendment of "men" to "individuals" was a non-substantive modernization of language because the provision already included both men and women. It was once customary to use masculine pronouns as gender-neutral inclusive terms. *See Norton*, 255 N.W. at 792 (rejecting argument that "men" was meant in a sex-specific sense rather than "in a generic sense"); Bryan A. Garner, *The Redbook, A Manual on Legal Style* 204 (4th ed. 2018). Evolving standards of formal English usage have prompted legislative drafters to use more neutral and inclusive language to avoid the archaic gender-neutral masculine. The only evident substantive purpose of the 1984 amendment was to expressly guarantee a right to bear arms.

[¶84] Contemporary evidence confirms this understanding. The 1984 amendment originated from a petition effort launched in January 1984 by the North Dakota Shooting Sports Association. *Effort launched*, Bismarck Tribune, Jan. 15, 1984, at 4B. The Association, an affiliate of the National Rifle Association, sought to add an individual right to keep and bear arms, "just setting in concrete the principles people already feel they have." *Arms petition gains signatures*, Bismarck Tribune, Mar. 12, 1984, at 11.

[¶85] Opposition to the measure was limited, primarily arguing that the amendment was "merely an ornament, and a flawed one" that added nothing to the Second Amendment. *Measure No. 3—No*, Minot Daily News, Oct. 26, 1984, at 4. The ballot language focused exclusively on arms rights: "Provides for the right to keep and bear arms for lawful purposes. [ . . . ] A 'yes' vote means you approve the constitutional measure concerning the right to keep and bear arms. A 'no' vote means you reject the constitutional measure concerning the right to keep and bear arms." Minot Daily News, Oct. 27, 1984, at 33.

[¶86] Contemporaneous news accounts reported the proponents were motivated by recent court decisions rejecting Second Amendment challenges to a Morton Grove, Illinois, ordinance banning sale and possession of handguns.

38

*Other cities' laws contribute to N.D. gun issue*, Bismarck Tribune, Nov. 4, 1984, at 1B. On the day before the election, the Bismarck Tribune described Measure 3 as "most assured of passage," stating one might vote no "if you think it's redundant" to the federal constitution's right to keep and bear arms. Bismarck Tribune, Nov. 5, 1984, at 4A. On the same page, the Bismarck Tribune printed three letters to the editor advocating the pro-life position on abortion, with one concluding: "We need to vote for candidates who have traditional family values and who respect the sanctity of human *life*. There is no greater issue!" *Id.* (emphasis in original). The measure overwhelmingly passed on Nov. 6, 1984, with 236,596 in favor and 58,582 opposed. 1985 N.D. Sess. Laws ch. 702. Evidence of the public understanding of voters is rarely this consistent or clear.

[¶87] I am aware of no evidence that any person voting in 1984 believed changing "men" to "individuals" would alter individual constitutional rights to include abortion, then, as now, a contentious political issue. One might argue that the plain language of the provision carries that meaning and whether or not the voters intended that, those were the words they voted to include. That would turn the absurdity canon on its head—we normally avoid clearly unintended results; to premise an abortion-inclusive interpretation of art. I, § 1 on an unintended meaning would run counter to every interpretive canon intended to aid in determining what substantive laws the lawmakers intended to enact with the words they used.

[¶88] RRWC has presented no reasoned basis to infer a substantive intent by the voters to update the meaning of art. I, § 1 to encompass the concept of "liberty" as of 1984. In contrast to what was added to section 1 (a right to bear arms), RRWC offers only inference built on silence to support the claim that the 1984 amendment froze into the constitution a new, broader scope of "liberty" that included the *Roe* abortion right. The district court's citations to later substantive due process cases such as *Casey* provide no insight into what the voters in 1984 intended by the amendment. "We must interpret what is actually contained in the Constitution, not what the parties would prefer it contained." *RECALLND v. Jaeger*, 2010 ND 250, ¶ 13, 792 N.W.2d 511. This argument fails.

D

[¶89] The district court also violated the party presentation principle. RRWC raised constitutional claims under art. I, § 1 and art. I, § 12 as well as vagueness, which is a due process claim. The first time in the record any reference was made to N.D. Const. art. I, § 25 was in the district court's order on summary judgment. In granting judgment to RRWC, the district court relied in part on the victims' rights provision in art. I, § 25: "The law also impermissibly infringes on the constitutional rights for victims of crimes." This appears to be the first reference in the record to that provision. Because no party asserted a constitutional claim under this provision, the district court erred when it raised and addressed a constitutional issue not presented by either party. *Overbo v. Overbo*, 2024 ND 233, ¶ 10; *State v. Hansen*, 2006 ND 139, 717 N.W.2d 541.

V

A

[¶90] The State argues it will suffer irreparable injury and that a stay would not cause substantial harm to RRWC because: (1) RRWC does not operate in North Dakota; and (2) N.D.C.C. ch. 12.1-19.1 allows for life- and health-preserving abortions. RRWC admits that because it no longer operates in North Dakota, "[p]ractically, denying the stay will therefore not result in the widespread availability of abortions in North Dakota outside the hospital setting." RRWC argues, however, that a stay would create confusion and ultimately chill the willingness of physicians to provide life- and health-preserving abortion care.

[¶91] As stated in *Wrigley*, "[t]he death of unborn children and the potential death or injury of a pregnant woman are both tragic." 2023 ND 50, ¶ 35. The State has a compelling interest in protecting unborn human life. *Id.* ¶ 29. These factors—whether there will be irreparable harm if the stay is not granted or if it is granted—are neutral in considering whether to grant the State's request for a stay. Although these factors should be weighed neutrally, RRWC's argument that a stay would create confusion and ultimately chill the willingness of

40

physicians to provide life- and health-preserving abortion care is misplaced, as discussed above.

B

[¶92] The State argues that a stay would serve the public interest, because: (1) upholding duly enacted statutes generally serves the public interest; (2) a stay would offset "the raw judicial power" exercised by the district court in its recognition of a new fundamental right to obtain a pre-viability abortion under the N.D. Constitution; and (3) a stay would maintain the status quo. RRWC responds that denying the stay would serve the public interest, because: (1) N.D.C.C. ch. 12.1-19.1 infringes on the fundamental right to obtain a life- and health-preserving abortion and "it is always in the public interest to protect constitutional rights"; and (2) denying the stay would preserve the status quo.

[¶93] The *Wrigley* majority noted that North Dakota's abortion regulation statute "is an issue of vital concern regarding a matter of important public interest." 2023 ND 50, ¶ 11. Because maintaining the status quo is a fundamental principle that informs the four criteria for granting a motion to stay, the Court must determine whether a stay would preserve the status quo here. *See Stop H-3 Ass'n v. Volpe*, 353 F. Supp. 14, 16 (D. Haw. 1972). In *Wrigley*, we held "the status quo in North Dakota for 49 years"—from *Roe v. Wade*, 410 U.S. 113 (1973) until *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)—"has been to allow for abortion care." *Wrigley*, at ¶ 38. Chapter 12.1-19.1, N.D.C.C., was in effect for approximately eighteen months, from April 23, 2023, until the district court issued its order declaring N.D.C.C. ch. 12.1-19.1 unconstitutional on September 12, 2024.

[¶94] A stay would preserve the status quo. The most recent edition of Black's Law Dictionary defines "status quo" as: "The situation that currently exists." *Black's Law Dictionary* 1709 (12th ed. 2024). The *Stop H-3 Ass'n* court explained that maintaining the status quo is a fundamental principle informing the four stay criteria. *Stop H-3 Ass'n*, 353 F. Supp. at 16. *Stop H-3 Ass'n* was published in 1973; an edition of Black's Law Dictionary published closer to that time defines "status quo" as: "The existing state of things at any given date." *Black's Law*

*Dictionary* 1581 (rev. 4th ed. 1975). Under that definition is the following citation: "Last actual, peaceable, noncontested condition which preceded the pending controversy." *State ex rel. Pay Less Drug Stores v. Sutton*, 98 P.2d 680, 683–84 (Wash. 1940), cited in *Black's Law Dictionary* 1581 (rev. 4th ed. 1975). Although access to abortion care had been the status quo in North Dakota for 49 years, for the most recent eighteen months, abortion regulation under N.D.C.C. ch. 12.1-19.1 was the status quo. A new "status quo" was not triggered by the district court's determination that the legislation is unconstitutional. Maintaining the status quo weighs in favor of granting the stay.

## VI

[¶95] I would grant the motion for a stay.

[¶96] Jerod E. Tufte

**Jensen, Chief Justice, dissenting.**

[¶97] I dissent from the majority opinion to deny the stay. I am persuaded by Justice Tufte's separate which leaves open a final decision on the merits and concludes a stay of the district court decision to hold unconstitutional an act of the legislature is required. My colleagues have provided scholarly reviews of the pending motion, with significant agreement on the legal framework for review of the pending motion for a stay. However, they ultimately reach different conclusions. I do not have significant disagreement with the legal framework adopted by my colleagues. I write separately to express my application of that framework in what I hope is plain language and explain why I reach the conclusion a stay is required.

## I

[¶98] Following the United States Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, regulation, if any, of abortion was returned to the individual states and specifically "to the people's elected representatives." 597 U.S. 215, 232 (2022). Each state legislature, subject to the language of its respective constitution, is now tasked with determining the scope of the right to

abortion, whether the state has a compelling interest in regulating that right, and whether any regulation is narrowly tailored to further the compelling interest. Individual states have taken vastly different approaches. As of December 20, 2024, abortion is banned in 12 states, has a gestational limit between 6 and 12 weeks in 6 states, has a gestational limit between 18 and 22 weeks in 4 states, has a gestational limit at or near viability in 19 states, and no gestational limit in 9 states and the District of Columbia. Either through legislation or their constitutions, the range of state regulation extends from allowing the procedure up to the time of birth to a total ban on the procedure.

[¶99] North Dakota, following the decision in *Dobbs*, banned the procedure but provided affirmative defenses to prevent the death of the pregnant female, to terminate a pregnancy that was the result of gross sexual imposition, sexual imposition, sexual abuse of a ward, or incest. In the context of reviewing the district court grant of an injunction, this Court determined our constitution provided a fundamental right to an abortion in instances where a woman's life or health were endangered. *Wrigley v. Romanick*, 2023 ND 50, ¶ 33, 988 N.W.2d 231. We also acknowledged the State's compelling interest in regulating the procedure and in protecting unborn children. *Id*. We upheld the injunction.

[¶100] Subsequent to our decision to uphold the injunction, the legislature repealed the prior regulation of abortion provided in North Dakota Century Code ch. 12.1-19 and enacted ch. 12.1-19.1 defining the limitations on abortions. The current law limits abortions to instances when a woman's life is endangered, when there is a serious health risk to the pregnant woman, and in instances where the pregnancy is the result of gross sexual imposition, sexual imposition, sexual abuse of a ward, or incest if the procedure is performed within the first six weeks. The definition of serious health risk includes medical conditions that necessitate an abortion to prevent substantial physical impairment of a major bodily function but excludes any psychological or emotional condition.

[¶101] Acknowledging the State has a compelling interest in protecting unborn children is significant. It provides the legislature, as the "people's elected representatives," with authority to regulate the procedure. Our function as the

Judicial Branch is not to define the limits of the procedure but to simply review whether the State's regulation is narrowly tailored to advance a compelling interest to the extent it conflicts with a fundamental right.

[¶102] As restrictive as this legislation may be, we are required to apply a presumption the legislature has acted in accordance with the constitution in enacting legislation. This principle is so significant in North Dakota that our constitution requires not just a majority of this Court to declare a statute unconstitutional, it requires a supermajority of four of the five members of the Court. Here, the legislation at issue was enacted in direct response to our prior decision determining a fundamental right to abortion where the life or the health of the mother are endangered. The current legislation statutorily recognizes the availability of the procedure to protect the life and health of the mother at any time during the gestational period, recognizes limited availability of the procedure in instances of rape and incest, and specifically excludes mental health conditions from the definition of serious health risk. Our prior decision found a fundamental right with respect to a woman's health and life and determined the State has a compelling interest even in those instances to engage in regulation of the procedure. We have not yet determined whether the scope of that right exceeds circumstances involving a woman's health or life, or if any regulation in addition to those circumstances would be subject to strict scrutiny.

II

[¶103] In the present case, the district court reached its holding after finding the statute was vague and finding a fundamental right to a pre-viability abortion. We have never previously applied the void for vagueness doctrine outside the First Amendment. While we may do so after review of the full merits, for the purpose of evaluating a motion for a stay, I cannot accept that a theory never before applied in this context defeats the presumption the legislation is constitutional. With respect to the district court's finding there is a fundamental right to pre-viability abortions, the court itself acknowledged that this was a novel finding. While we may do so after a review of the full merits, for the purpose of evaluating a motion for a stay, I cannot accept a theory the court

44

recognized as novel defeats the presumption the legislation is constitutional. Our review of the request for a stay is not intended to be a final determination on the merits. Regardless of how restrictive this legislation may be, in the context of a stay, I believe we are compelled to grant the stay of the district court's determination that the legislation is unconstitutional.

[¶104]  Jon J. Jensen, C.J.